**NATIONAL WILDLIFE FEDERATION,
et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

The City of Fort Smith,
Arkansas, Intervenor.

No. 88–1697.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 22, 1989.

Decided July 31, 1990.

S. Elizabeth Birnbaum, for petitioners.

Samuel Soopper, Attorney, F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, Joseph S. Davies, Deputy Sol., F.E.R.C., were on the brief, for respondent.

Don S. Smith, for intervenor.

Before D.H. GINSBURG and SENTELLE, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed PER CURIAM.

PER CURIAM:

The National Wildlife Federation, et al. ("NWF") petitions for review of orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission") granting to the City of Fort Smith, Arkansas, ("Fort Smith") a license for the construction and operation of a dam on Lee Creek, near the Arkansas–Oklahoma border. Because a small hydroelectric powerhouse was to be built along the dam, FERC jurisdiction attached to the project which was undertaken primarily to satisfy the water-supply needs of Fort Smith. The questions presented for review are whether FERC, in granting the license, failed to comply with certain requirements, involving the consideration of the projected environmental impact of the proposed dam, of the Federal Power Act ("FPA"), 16 U.S.C. §§ 797(e), 803(a), and 803(j), the Clean Water Act ("CWA"), 33 U.S.C. § 1341, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C). We find no reason to disturb FERC's actions and accordingly deny the petition for review.

## I. BACKGROUND

In the late 1970s, Fort Smith, aware that its municipal water supply would not be able to meet the demands of its growing populace, decided to create a reservoir by building a dam on Lee Creek. Lee Creek flows south from Oklahoma into Arkansas, and the proposed dam was to be built in Crawford County, Arkansas, just south of the Oklahoma–Arkansas border. The proposed dam was to enable Fort Smith to construct a reservoir in Arkansas, but it was also going to flood parts of Oklahoma. In November 1983, Fort Smith sought from FERC a license to construct, operate and maintain a small hydroelectric generator at the proposed Lee Creek site.

As envisioned by Fort Smith, the proposed project was to be implemented in two phases. The initial phase ("Phase I") was to allow for an approximately 10 million-gallon-per-day water supply. "Phase II," the eventual extension of Phase I envisioned by Fort Smith, was further to increase substantially Fort Smith's water supply. Phase II was to entail environmental costs over and above those of Phase I because the rise in the height of the dam would increase the total area of lands flooded, and would eliminate part of Lee Creek in Oklahoma, including several miles of an Oklahoma state-designated scenic river.

Because approval of the proposed project would constitute a major federal action "significantly affecting the quality of the human environment" within the meaning of NEPA, 42 U.S.C. § 4332(2)(C), FERC directed its staff to prepare an environmental impact statement ("EIS") relating to the proposed dam. After a public hearing and a meeting with interested parties concerning the projected environmental impact of the proposed dam, FERC issued a draft EIS and solicited comments from interested parties and the public. In February 1987, FERC issued a final EIS in which it addressed many of the comments received in response to its draft EIS.

In March of 1988, although numerous objections to the proposed dam project remained, FERC granted Fort Smith's license application with a few conditions and modifications. Order Issuing License (Minor), 42 FERC ¶ 61,361 (1988). FERC subsequently denied various requests for rehearing and upheld its grant to Fort Smith of a license to undertake the Lee Creek dam project. Order on Rehearing, 44 FERC ¶ 61,160 (1988). The State of Oklahoma and the Oklahoma Water Resources Board (collectively "Oklahoma") petitioned this Court for review of FERC's grant of the license, arguing that FERC had failed to comply with certain FPA and CWA requirements involving consideration of the environmental impact of the dam. NWF also petitioned this Court, raising most of Oklahoma's FPA and CWA contentions, as well as other challenges based on the FPA and NEPA.

During the pendency of this litigation, Oklahoma and Arkansas agreed to a settlement which addressed many of Oklahoma's concerns. Pursuant to Oklahoma's request, this Court dismissed Oklahoma's petition with prejudice. NWF's petition remains, however, and that petition raises substantially the same arguments as did Oklahoma's petition.

First, NWF contends that FERC failed to consider adequately the potential environmental effects of Phase II of the dam project in deciding whether to approve Phase I of that project. FERC's failure to take into account the environmental impacts of Phase II, according to NWF, violated both the FPA and NEPA. Second, NWF argues that FERC violated several other provisions of the FPA by failing to consider adequately and follow the recommendations of various relevant federal and state agencies and by including the water-supply gains from the dam as a benefit of the dam project to be weighed against the costs. Third, NWF argues that FERC violated section 401(a)(2) of the CWA by granting the Fort Smith license without requiring the city to obtain a water-quality certification from Oklahoma. Finally, NWF argues that FERC's EIS did not comply with NEPA because the EIS failed to explore reasonable alternatives to the project and because the EIS was based in part on data compiled by a concededly interested party.

II. FERC's CONSIDERATION OF PHASE II

Phase I of Fort Smith's original dam proposal was designed to satisfy the municipality's short term anticipated needs of about 10 million gallons per day, which required a reservoir water level of 420 feet above mean sea level. The project was to inundate approximately 3.7 miles of free-flowing stream habitat and approximately 1.5 miles, out of 49 miles, of Lee Creek that was listed in the Nationwide Rivers Inventory.

Fort Smith's initial proposal also contemplated that average daily water consumption in the population served by Fort Smith would increase during the course of ten to fifteen years, requiring an expansion of the reservoir in Phase II. The Phase II expansion of the dam project, which was expected to yield about 70 million gallons per day of water, was to raise the water level to 462 feet above mean sea level, thereby flooding several more miles of Lee Creek, possibly including some river miles designated for protection by the Oklahoma legislature. The Phase II plans for eventual expansion of the reservoir were included in Fort Smith's original dam proposal.

In the hearings before FERC many of the intervenors were not as concerned about Phase I as they were about the contemplated expansion of the reservoir built into Phase II of Fort Smith's plan. In response to various intervenors' concerns, Fort Smith resubmitted a modified license application which incorporated changes addressing some intervenors' concerns and which specifically withdrew Fort Smith's request for approval of its Phase II plans.

The Commission, in its original order granting the license, specifically stated that "[t]he present application does not propose, and we do not approve in this order, construction of Phase II." Order Issuing License (Minor), 42 FERC ¶ 61,362 at 62,051. Following Commission approval of the dam project, then, if Fort Smith wished to implement Phase II by expanding the reservoir it would have to seek Commission approval for its proposed expansion. The Commission consequently adopted an EIS that did not fully consider the environmental impact that might follow from an implementation of Phase II and did not fully consider that impact in granting the license for Phase I.

NWF argues that FERC, in determining whether to issue a license, must, in light of both the plain language of the FPA and any reasonable interpretation thereof, determine not just whether a particular proposal passes statutory and regulatory muster, but whether the "comprehensive plan" submitted is beneficial. According to NWF, FERC acted improperly under the FPA by failing to consider the potential effects of Phase II. Moreover, NWF argues that FERC violated NEPA by failing

to adopt an EIS that fully accounted for the possible impact of Phase II.

## A. FERC's Failure to Consider Phase II and the FPA

■ Section 10(a)(1) of the FPA, as amended, provides that the Commission shall have the authority to require the modification of any project before approving that project so that the project adopted is, in the judgment of the Commission,

> best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife ... and for other beneficial public uses....

16 U.S.C. § 803(a)(1).

The NWF, relying on this statute and *LaFlamme v. FERC*, 852 F.2d 389 (9th Cir.1988), argues that prior to approving the proposed dam project FERC should have considered a comprehensive plan for developing the waterway that evaluated the project's effect on present and future projects within the basin. Specifically, NWF argues that FERC should have taken into account Phase II of the project because Phase I paved the way for the subsequent implementation of Phase II. According to NWF, FERC had an obligation to analyze Fort Smith's application in a comprehensive manner, meaning it should have considered both contemplated phases of the dam project before granting the license.

The Commission explicitly stated in its initial order that it was reviewing only the proposal to construct a dam and reservoir according to the Phase I plans before it. Order Issuing License (Minor), 42 FERC ¶ 61,362 at 62,051. The Commission stated in its second order, "Phase I neither precludes nor makes inevitable Phase II." Order on Rehearing, 44 FERC ¶ 61,160 at 61,510. Further, the Commission stated that neither section 10(a)(1) nor *LaFlamme* mandates that when determining whether to grant a license, the Commission must consider each conceivable use of the project

or environment and "develop an immutable master plan." *Id.* Rather, the Commission stated that "comprehensive development is a concept that evolves over time, reflecting different eras' technical options, economic realities, and resource use priorities." *Id.*

Upon examining *LaFlamme*, FPA section 10(a)(1), and the circumstances of this case, we conclude that the Commission did not run afoul of the FPA when it granted Fort Smith's license application without more thoroughly considering the potential environmental effects of later possible expansions of the dam project.

In *LaFlamme*, FERC had issued a license for a power project after examining only the various effects of the proposed project itself. The license application at issue was one of several pending before the Commission at the time, and FERC had already approved several proposed projects in the same river basin. On review, the Ninth Circuit held that section 10(a) of the FPA required FERC to evaluate the effects of the proposed project with reference to the entire water system of which that project was a part. *LaFlamme*, 852 F.2d at 402–03. The court thus found that the Commission's inquiry was insufficient because the Commission had failed to examine the effects of the proposed project on the other projects within the system, the impact of those other projects on the proposed project, and the impact of the entire water system as a whole. *Id.*

Though the reasoning of *LaFlamme* is persuasive, the present dispute is factually distinguishable. The proposed Lee Creek dam was not part of a larger contemplated water system, and NWF presented no evidence of other related projects for which license applications were pending before the Commission or which had been approved by the Commission. NWF also did not present the Commission with any evidence that tributaries or rivers other than Lee Creek would be affected by the dam in such a way as to require FERC to consider the project's impact on other waterways. The Commission thus did not evaluate in isolation a proposed project that actually

constituted a mere part of a larger development scheme.

Nor did the Commission improperly ignore the potential effects of Phase II in considering Fort Smith's application. No applications were pending before the Commission to expand the Lee Creek project to implement Phase II of the initial plan. In fact, in light of Fort Smith's explicit withdrawal of those aspects of its application relating to Phase II, the Commission had no reason to believe that Fort Smith would necessarily apply to implement Phase II. FERC thus correctly found that the FPA did not require it to delve into the potential ramifications of Phase II in reviewing the license application for Phase I.

### B. FERC's Failure to Consider Phase II and NEPA

■ NEPA, like the FPA, requires that an agency of the federal government, when reviewing proposals requesting federal action, include an EIS in every recommendation or report on proposals for major federal actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). The EIS should detail:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

The regulations implementing NEPA provide that where proposed actions are connected or cumulative they should be "discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1) & (2) (1989). Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.* at § 1508.25(a)(1). Actions are cumulative if, when viewed with other proposed actions, they have "cumulatively significant impacts." *Id.* at § 1508.25(a)(2). The statutory and regulatory scheme requires comprehensive analysis of the impact of connected or cumulative proposed actions in order to "prevent agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 297–98 (D.C.Cir.1988) (quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985)).

NWF argues that FERC should have prepared a comprehensive EIS covering both Phases I and II of the Lee Creek Project. NWF cites *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1090 (D.C.Cir. 1973), and *Swain v. Brinegar,* 542 F.2d 364, 369 (7th Cir.1976) (*en banc*), for the proposition that if a commitment of resources to one action is likely to restrict later alternatives, an EIS should address all of the environmental issues raised by the entire project. The question, according to NWF, is not whether granting a license for Phase I makes Phase II inevitable, but is whether granting the Phase I license limits future alternative uses of the resource too restrictively. Because Phase II would become a cheaper and thus more attractive alternative for a future expansion of Fort Smith's water supply once Phase I was completed, NWF argues that FERC, in preparing its EIS, should have taken into account not only the impact of Phase I of the project, but also the potential effects of Phase II. NWF fears that by granting the license for Phase I the Commission irretrievably committed resources, thereby severely limiting FERC review should the Commission later consid-

er the best alternatives to a licensing request for Phase II.

NWF further argues that although Fort Smith may not have formally sought a license for Phase II, the Commission nonetheless reviewed the benefits of Phase II when considering the alternatives to Fort Smith's proposal. Specifically, NWF argues that FERC compared the water capacity available under Phase II of the dam project with the alternative supplies available through other plans. In essence, the petitioners believe that FERC engaged in a sleight of hand by comparing the water supply available upon completion of Phase II—and the corresponding benefit of alleviating Fort Smith's anticipated water needs—against the detriment associated with Phase I.

Responding to NWF's first argument, the Commission maintains, again, that Phase II will by no means inevitably follow from Phase I. The Commission cites *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976), and argues that NEPA does not require an agency to consider the possible environmental impacts of speculative or hypothetical actions when preparing an impact statement on proposed actions. Rather, contends the Commission, NEPA merely requires an agency to consider all other *proposed* actions that may, along with the proposed action in issue, have a cumulative or synergistic impact on an environment. According to the Commission, in this case Phase II was not proposed at all, and the grant of a Phase I license in no way restricted future alternatives. In fact, in its Order on Rehearing the Commission explicitly noted that enlargement of the Lee Creek reservoir pursuant to Phase II plans would likely have a number of highly significant adverse impacts to water quality, fisheries, and recreation and thus might not be approved in a later proceeding. 44 FERC ¶ 61,160 at 61,515. *See also* Order Issuing License (Minor), 42 FERC ¶ 61,362 at 62,052.

The Commission further denies that it improperly considered the benefits from Phase II in evaluating the Phase I license application. The Commission argues that it merely examined, as one factor in its calculus, possible future expansions of the various alternatives to Fort Smith's proposal. Order on Rehearing, 44 FERC ¶ 61,160 at 61,514–15.

We conclude that the Commission was not required more thoroughly to evaluate the possible effects of Phase II in its EIS. In *Kleppe v. Sierra Club* the Court held that the Department of the Interior need not execute a regional EIS regarding a proposal seeking approval for private development of certain coal reserves on federal land. The Sierra Club had argued that because the Department of the Interior "contemplated" regional development when it evaluated the proposal, NEPA required the Department's EIS to take into account the regional effects of the otherwise limited proposal. The Supreme Court rejected this contention, arguing that an agency must prepare an EIS concerning an action at " 'the time at which it makes a recommendation or report on a *proposal* for federal action.' " 427 U.S. at 406, 96 S.Ct. at 2728 (quoting *Aberdeen & Rockfish R.R. Co. v. SCRAP,* 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975)) (emphasis in *SCRAP*). Because "the contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action," an EIS regarding a project that had not yet reached the proposal stage would be unnecessary. *Id.* The Court thus concluded that section 102(2)(C) of NEPA requires only that an EIS be conducted in regards to the proposed action.

■ The Court conceded that "when several proposals for [related] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together," *id.* 427 U.S. at 410, 96 S.Ct. at 2730, but the Court explicitly limited the application of this requirement to existing, presently proposed actions that might have cumulative or synergistic effects. The Court wrote:

At some points in their brief respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

*Id.* at 410 n. 20, 96 S.Ct. at 2730 n. 20 (emphasis in original). *Kleppe* thus clearly establishes that an EIS need not delve into the possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to or act cumulatively with the proposal at issue. In this case, the Commission did not ignore any relevant proposals involving Lee Creek. Fort Smith withdrew its proposals with respect to Phase II, as we have already noted, and any claim that it would reintroduce its Phase II proposal was merely speculative and hypothetical.

NWF's reliance on *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079 (D.C.Cir.1973), wherein this Court ruled that future, yet unproposed projects should be considered in the EIS analyzing a proposal if the envisioned future projects would impact the relevant environment, is misplaced. We seriously doubt that the relevant reasoning in *Scientists' Institute* survives the Supreme Court's *Kleppe* decision. Moreover, given that, by approving Phase I, the Commission did not in any way bind itself to approve Phase II, *Scientists' Institute* may not even support NWF's claim.

We further conclude that the Commission did not improperly consider the benefits of the possible Phase II expansion in evaluating the Phase I application. In reviewing Fort Smith's application FERC compared and analyzed the various alternatives to the proposed project not only with reference to their relative abilities to satisfy Fort Smith's present water demands, but with an eye to their relative potentials to satisfy Fort Smith's future water needs. In doing so, the Commission did take into account factors relating to Phase II of the Lee Creek project. FERC did not, though, compare the 70 million-gallon-per-day yield of Phase II to the present yields of the alternatives to the project. Rather, FERC weighed each alternative against Fort Smith's application, weighing, among other things, the potential for expansion of the available alternatives against the potential for expansion of the proposed Lee Creek dam project.

The mere fact that it considered possible future expansion as one factor in its evaluation of the present project does not bind FERC to consider the future harms and benefits of a proposal not before it. Moreover, FERC is by no means bound to later approve Phase II merely because it considered the possibility of later expansion in approving Phase I. When comparing present alternatives, the Commission should consider potential future expansion to accommodate future needs. By doing so the Commission neither automatically brings Phase II under Commission review nor binds itself to later approve Phase II. In fact, Fort Smith would take a risk if it implemented Phase I at great initial expense, relying on a belief that Phase II would ultimately be approved by the Commission and would render its initial action profitable. Fort Smith may later be forced to rely on numerous smaller and arguably more expensive water-supply sources to meet its future water needs. We cannot hold that FERC acted arbitrarily by analyzing potential future development.

The Commission did not have before it a proposal for a license as to Phase II and, although the Commission in reviewing the future ramifications of granting Fort Smith's application did consider benefits that might ensue from the implementation of Phase II of the Lee Creek dam project,

the Commission in no way approved Phase II. The Commission was thus not required to consider the potential environmental impact of Phase II of the project in its EIS regarding Fort Smith's application.

### III. OTHER FPA ISSUES

NWF points to two other provisions of the FPA that it claims FERC violated. First, NWF argues that the Commission failed to give adequate consideration to the proposals of various wildlife agencies as required by section 10(j) of the FPA. Second, NWF contends that the Commission improperly considered the water-supply benefits of the project in determining whether to grant Fort Smith's application, in violation of section 4(e) of the FPA.

### A. *FERC's Consideration of Various Agencies' Recommendations*

Section 10(j)(1) of the FPA, as amended, provides:

> That in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife ... affected by the development, operation, and management of the project, each license issued under this subchapter shall include conditions for such protection, mitigation, and enhancement.... [S]uch conditions shall be based on recommendations ... from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies.

16 U.S.C. § 803(j)(1). The statute further provides that whenever the Commission believes that any recommendation referred to in the above paragraph may be inconsistent with the Commission's legal duties, the Commission and the relevant agency should attempt to resolve the inconsistency, giving due weight to the recommendations, expertise, and statutory responsibilities of the agency. *Id.* § 803(j)(2). If the Commission does not adopt, in whole or in part, a recommendation of one of the listed agencies, the statute requires the Commission to publish, together with the basis for each of the findings,

(A) A finding that adoption of such recommendation is inconsistent with the purposes and requirements of this subchapter or with other applicable provisions of law.

(B) A finding that the conditions selected by the Commission comply with the requirements of [§ 803(j)(1)].

*Id.*

NWF argues that the Commission failed to give due consideration to two general sets of recommendations. First, NWF argues that the Commission improperly ignored various agencies' recommendations that FERC's consideration of Fort Smith's proposal should include review of Phase II of the Lee Creek dam project. Second, NWF contends both that the Commission failed to consult with the Oklahoma Department of Wildlife Conservation ("ODWC") before rejecting ODWC's recommendations and that FERC's rejection of ODWC's recommendations was not supported by substantial evidence.

### 1. Recommendations Regarding Consideration of Phase II

■ Several agencies described in FPA section 10(j)(1) recommended to FERC that its review of the Fort Smith application should include review of Phase II. For example, the Arkansas Game & Fish Commission objected to the Fort Smith Project, in part because "the opportunity to mitigate fish and wildlife losses [is] foregone or nullified ... in the case of Phase I planning and evaluation followed by Phase II construction." Letter from Arkansas Game & Fish Commission to FERC 1 (May 29, 1985) (Joint Appendix ("J.A.") 529). The Secretary of the Interior similarly protested that Phase I would "lead to approval of future phases as fait accompli." Letter from United States Department of the Interior to FERC 1 (Apr. 16, 1985) (J.A. 532).

NWF argues that FERC failed either to heed these recommendations, or adequately to explain its failure to do so. To the extent that the recommendations constituted a challenge to the adequacy of FERC's EIS rather than recommendations for FERC's disposition of the application, NWF

claims that section 10(j) still required FERC to follow or respond to the agencies' recommendations. FERC's refusal to compile information sought by the state and federal resource agencies, according to NWF, prevented those agencies from fulfilling their section 10(j) mandates.

We conclude that the Commission did not improperly ignore the various agencies' recommendations regarding consideration of Phase II. Section 10(j) requires FERC to respect other agencies' recommendations in approving a proposal under the FPA. 16 U.S.C. § 803(j). FERC is not bound, however, to respond to or to follow the recommendations of other agencies regarding proposals not before the Commission. As we have explained at length, FERC was not reviewing an application for Phase II of the Lee Creek dam project. Consequently, FERC was not bound under section 10(j) to accord weight to the various agencies' recommendations to the extent that the recommendations revolved around Phase II of the dam project rather than the proposal before the Commission. Insofar as the various agencies' recommendations involved Phase II, then, they do not qualify as recommendations for conditions or mitigation under section 10(j).

■ Even if the recommendations do, to some extent focus on the actual proposed project before the Commission, we conclude that while the Commission must pay due regard to such recommendations, the statute cannot be read to force upon the Commission the burden of strict acceptance of each and every proper recommendation. While the Commission must address each recommendation, the discretion ultimately vests in the Commission as to how to incorporate each recommendation. If we read the statute any other way, the Commission would be held hostage to every agency recommendation, and the Commission's role of reconciling all competing interests would be compromised.

## 2. ODWC's Recommendations

■ ODWC opposed the Lee Creek dam project and recommended that the license be denied because the project's effects could not be mitigated. Specifically, ODWC concluded that the flooding of parts of Oklahoma would result in the stagnation of water, leading to the reduction of diversity in the fish population through the establishment of dominance by rough fish better adapted to reservoir conditions. For instance, the ODWC feared that the Lee Creek dam project would result in a reduced smallmouth bass population and increased populations of gar, buffalo, and carp, among others. Further, and more important, the ODWC was concerned that the population of the longnosed darter, a fish already on the State of Oklahoma's endangered species list, would be reduced if the reservoir were constructed. The ODWC warned that the longnose darter was nearly extinct and that the construction of the project could violate the Oklahoma Endangered Species Act.

In its Order on Rehearing the Commission made the finding required by section 10(j)(2) before it could proceed in the face of contrary recommendations from a relevant wildlife agency. 16 U.S.C. § 803(j)(2). The Commission wrote, "To the extent that our issuance of the license for this project is inconsistent with ODWC's recommendation, we conclude that our license conditions adequately and equitably protect, mitigate damages to, and enhance fish and wildlife." 44 FERC ¶ 61,160 at 61,511. The Commission stated that it intended to ensure that the project's effect on the smallmouth bass fishery would be minimal, that it was requiring fish screens on all project intakes, and that it was requiring a study to determine the scope of measures needed to minimize the potential effects of project construction and operation on the longnose darter. *Id.* The Commission explained that it was requiring the studies in an effort to do what it could to avoid the loss of the longnose darter while proceeding with the construction and operation of the Lee Creek dam project but conceded, "[W]e are prepared to accept the loss of these fish at this site in exchange for the overall benefits to be produced by this project...." *Id.* (quoting Order Issuing License (Minor), 42 FERC ¶ 61,362 at 62,-049).

NWF argues first that the Commission violated section 10(j)(2) of the FPA by making this finding without first consulting with the ODWC regarding FERC's belief that the recommendation was inconsistent with the law. NWF argues that section 10(j)(2) was designed to make FERC actually consult with wildlife agencies before acting contrary to those agencies' recommendations. Further, NWF argues that FERC's findings rejecting the recommendations of the ODWC were not supported by substantial evidence and that FERC did not, as it claimed, assure adequate mitigation of the harmful effects of the Lee Creek dam.

■ The Commission contends that section 10(j) was designed to require the Commission to give serious attention to the recommendations of all fish and wildlife agencies, but that the section was not intended to give those agencies veto power or mandatory authority over the Commission's decisions. Further, the Commission argues that its ultimate conclusion was supported by substantial evidence. Although the Commission is required to give equal consideration to environmental values and the need for development, it is not necessarily required to give these sets of competing values equal weight in every situation. In this case, the Commission studied the benefits from development of the Lee Creek dam, and concluded that those benefits justified the environmental costs.

We conclude that the Commission adequately reviewed ODWC's recommendations and that the Commission's conclusions were supported by substantial evidence. The Commission did not, as NWF implies, ignore ODWC's recommendations. In fact, the Commission explicitly addressed ODWC's claims in its Order on Rehearing. 44 FERC ¶ 61,160 at 61,510–11. FERC thus did, as required by section 10(j)(2), attempt to "resolve any [inconsistencies], giving due weight to the recommendations, expertise, and statutory responsibilities of [the relevant agency]." 16 U.S.C. § 803(j)(2).

Moreover, we conclude that FERC's resolution was supported by substantial evidence. The EPA independently concluded that FERC's conditions were adequate. In its Order on Rehearing, FERC outlined the steps it had taken and planned to take to address the ODWC's concerns. 44 FERC ¶ 61,160 at 61,510–11. The Commission stated that various agencies, including ODWC itself, conceded that partial mitigation of fishery impacts for Phase I of the project could be accomplished. *Id.* at 61,-511. The Commission noted that it had provided for the filing of a plan for the propagation of a warm-water fishery to ensure that the dam project's effect on the smallmouth bass fishery would be minimal. *Id.* Further, the Commission noted that it was requiring the installation of fish screens on all project intakes. *Id.* Finally, the Commission explained that it was requiring a study to determine the scope of measures needed to minimize the potential effects of the project on the longnose darter, but that it was prepared to accept the loss of the longnose darter in exchange for the overall benefits of the Lee Creek dam project. *Id.* The Commission recognized that the project would cause some adverse impact to the environment surrounding the Lee Creek dam, but concluded that this adverse impact was outweighed by the water supply, water power, and recreational benefits expected from the dam. *Id.*

The Commission's conclusions are adequately supported in the record. The Commission did adopt plans to minimize the impact of the dam project on the Lee Creek environment, and reasonably concluded that those harms which were inevitable were offset by the benefits of the project. Although the FPA requires that the needs of wildlife be taken into consideration when FERC evaluates license applications, those considerations need not always prevail. In this case the Commission appropriately considered Fort Smith's serious water needs and reasonably concluded that those needs outweighed the potential harms to the environment from the project. The Commission was not bound to reject the Lee Creek dam project just because the ODWC contended that the environmental harms from

the project could not be mitigated. The Commission's actions are not subject to the effective veto of every state or federal wildlife agency, and consensus is not required before the Commission can authorize a project to proceed. Rather, the Commission is required to give due consideration to all recommendations from relevant agencies, to reconcile inconsistencies between those agencies' recommendations and the Commission's plans to the extent possible, and to explain its reasons for departing from the agencies' recommendations when it concludes that it must do so in order to fulfill its statutory mandate. We conclude that FERC satisfied these requirements.

B. *FERC's Consideration of Water–Supply Benefits*

■ Section 4(e) of the FPA, as amended, empowers FERC to

issue licenses ... for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction....

16 U.S.C. § 797(e). The FPA further provides:

In deciding whether to issue any license ... the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife ... the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

*Id.*

NWF argues that this provision requires that the Commission weigh the power and development purposes underlying a license application—meaning the purposes involving facilitating navigation or power trans-mission—against the environmental costs of the proposed project. NWF contends that water-supply benefits are not listed in the statute as a relevant factor to count in favor of a project and that the Commission is limited to considering only the navigation and power benefits of a proposed project. Because the Lee Creek dam would yield no navigation benefits and because the power-production benefits of the project would be concededly minimal, NWF argues that FERC erred in finding that the benefits of the project would outweigh the environmental costs.

In its orders, the Commission responded to NWF's contention by arguing that the language and legislative history of the FPA amply demonstrate that FERC is entitled to consider water-supply benefits in conducting its section 4(e) analysis. The Commission explained, "[S]ince water supply does not appear to fit on the side of the scale that includes energy conservation, fish and wildlife, recreation, and other aspects of environmental quality, it must be assumed either that water supply belongs within the meaning of 'development' or that [the final sentence of section 4(e)] does not purport to list all beneficial uses to be considered, but rather is intended to give emphasis to the due consideration of specific uses." Order on Rehearing, 44 FERC ¶ 61,160 at 61,512.

Our job is where possible to "give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If Congress has not directly addressed a precise question we should uphold the agency's construction as long as it is permissible. *Id.* at 843, 104 S.Ct. at 2781–82. We conclude that the Commission's construction of section 4(e) in this case is entitled to *Chevron* deference.

The Commission has traditionally exercised jurisdiction to license even those dams which are not exclusively or even primarily built for the purpose of power generation. Congress would not likely confer upon the Commission jurisdiction to approve or reject such projects and then

bar it from considering other than the power and navigation benefits of the proposed projects in making its decisions. Given that FERC has jurisdiction over projects with substantial non-power benefits, it makes sense to read section 4(e) as providing that FERC can and should consider those benefits in evaluating those projects.

Such a reading is by no means in tension with the plain language of section 4(e). The statute requires the Commission to consider environmental factors "in addition to the power and development purposes," but does not remove from Commission consideration factors, other than those relating to power and navigation, that are important to a proposed project. The Commission reasonably concluded that under section 4(e) the benefit of a secure and increased water supply may be considered as a development benefit or purpose to be weighed against environmental detriments from a proposed project.

The Commission's reading of the statute is further supported by section 10(a)(1) of the FPA which provides that the Commission should ensure that proposed projects are best adapted to serve a number of beneficial uses "including ... water supply." 16 U.S.C. § 803(a)(1). Given that the Commission is explicitly directed to consider the water-supply benefits of a proposed project in deciding what modifications, if any, to require of a proposal, *id.*, it makes sense that the Commission is also empowered to consider those benefits in deciding whether to grant a license at all. We thus conclude that the Commission did not err in considering the water-supply benefits of the Lee Creek dam project in deciding whether or not to grant Fort Smith's application.

### IV. FERC'S COMPLIANCE WITH THE CLEAN WATER ACT

■ The Clean Water Act provides:

(1) Any applicant for a Federal license or permit to conduct any activity ... which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge origi-

nates or will originate ... that any such discharge will comply with the applicable provisions [of certain listed sections] of this title.

33 U.S.C. § 1341(a)(1). The Act further provides that whenever such a discharge might affect the quality of the waters of any other state so as to violate any water quality requirement in that state, that state must be notified of the application and afforded an opportunity for a hearing. *Id.* § 1341(a)(2).

NWF argues that the Lee Creek dam project would result in a discharge originating in Oklahoma. The dam would back up the waters flowing in from Oklahoma, and would cause severe soil erosion within Oklahoma, according to NWF. Because the project would result in a discharge that would originate in Oklahoma, NWF contends that FERC was required to obtain the requisite certification from the Oklahoma Water Resources Board ("OWRB") before approving the project. FERC was unable to obtain such certification, and its approval of the Lee Creek dam project, NWF asserts, thus violated the CWA.

The Commission responds that a certification is only required under the CWA from the state in which a discharge originates. Other states, even if they are affected by a discharge, have only an advisory role in regulating the discharge, and they do not have the authority to block the issuance of permits if they are dissatisfied with the proposed standards. The Commission contends that in this case the discharge would occur at the dam, several miles within the Arkansas border.

We conclude that the Commission acted properly in approving the project without certification from the OWRB. The Commission is clearly only required to obtain a certification from the state where the discharge originates. As the Supreme Court explained in *International Paper Co. v. Ouellette*, 479 U.S. 481, 490, 107 S.Ct. 805, 810–11, 93 L.Ed.2d 883 (1987),

While source States have a strong voice in regulating their own pollution, the CWA contemplates a much lesser role for States that share an interstate water-

way with the source.... Even though it may be harmed by the discharges, an affected State only has an advisory role in regulating pollution that originates beyond its borders .... [and] does not have the authority to block the issuance of the permit if it is dissatisfied with the proposed standards.

Moreover, the Commission did not abuse its discretion in determining that in this case the discharge would originate by the dam—in Arkansas, not Oklahoma. Common sense supports FERC's conclusion that the discharge in this case would occur at the dam, where the flow of water would be blocked and consequently the water would be backed up, rather than at some point upstream where the water ended up or where the soil eroded as a result of the blockage downstream.

Further, Oklahoma withdrew all objections to the project as a result of the Settlement Agreement and it amended its water-quality standards to provide explicitly that the changes in water quality caused by the impoundment of water by the hydroelectric project to be constructed on Lee Creek would not constitute a violation of those standards. Thus, even if the discharge in question did originate in Oklahoma, we doubt that the CWA would pose a genuine barrier to FERC's approval of the Lee Creek dam project.

## V. THE ADEQUACY OF FERC'S EIS UNDER NEPA

In addition to arguing that the Commission's EIS regarding the Lee Creek dam project should have examined the projected impact from Phase II, NWF contends that the Commission's EIS was deficient for two other reasons. First, NWF argues that the Commission failed adequately to consider alternatives to the Fort Smith proposal. Second, NWF contends that the Commission's EIS rests in part on data compiled by a party with a conceded conflict of interest, rendering the EIS suspect.

### A. *The Commission's Consideration of Alternatives*

■ NEPA requires that reasonable alternatives to a proposed project be evaluated in the EIS. 40 C.F.R. § 1502.14 (1989). NWF argues first that the Commission failed to consider any alternatives to the hydropower portion of the Lee Creek dam project. Although the Commission did consider some alternatives to satisfy the water-supply purposes of the project, it did not really explore other means of satisfying the power-production purposes of the project. According to NWF, the Commission's EIS is therefore deficient. Second, NWF argues that FERC neglected to examine in its EIS alternatives that would satisfy the water-supply purposes of the project. Specifically, NWF charges that the Commission improperly declined to consider the possibility of reallocating some waters from Tenkiller Ferry Lake, in Oklahoma, on the grounds that interstate transfer of waters requires legislative approval in Oklahoma and is discouraged in Arkansas. NWF explains that the Tenkiller Lake water could be allocated to those communities within Oklahoma currently supplied by Fort Smith, thus leaving Fort Smith more water from its already existing supply. NWF further contends that the Commission improperly rejected the alternative of water conservation.

The Commission responds that it did not consider in depth alternatives to the hydropower portion of Fort Smith's proposal because the dam was proposed to satisfy water-supply needs, not power needs. Moreover, the Commission argues that it did adequately consider alternatives to the water-supply portion of the Fort Smith proposal but that, in the end, it rejected those alternatives.

We conclude that the Commission's EIS did adequately evaluate alternatives to the Lee Creek dam project. The Fort Smith proposal was designed to satisfy Fort Smith's water-supply needs. The production of hydroelectric power was merely incidental to the project. Any alternative that would facilitate the production of the same amount of power without satisfying Fort Smith's water-supply needs would not satisfy the central goal of the proposed project and thus would not constitute a

reasonable alternative to the Lee Creek dam project. The Commission thus properly concluded that "reasonable alternatives are those that address [Fort Smith's] need for water." Order on Rehearing, 44 FERC ¶ 61,160 at 61,515.

Further, the Commission did consider various alternatives that would satisfy the water-supply goals of the Fort Smith proposal. The final EIS contains an analysis of the conservation alternative, but concludes that even with a conservation plan, eventually Fort Smith's water demand will exceed system limits. Lee Creek Project, Final Environmental Impact Statement § 2.3 (Feb. 1987) (J.A. 86–87). The EIS also extensively examined various aspects of the Lake Shepherd Springs alternative, the Blue Mountain Lake alternative, the Pine Mountain alternative, the Cedar Creek alternative, the Lee Creek–Cedar Creek alternative, the Arkansas River alternative, and the Arkansas River alluvium alternative.

The Commission did not explore the Tenkiller Reservoir option more thoroughly because it concluded that Oklahoma and Arkansas law and policy disfavored interstate transfer of water, and that the amount of water that could be reallocated from Tenkiller Reservoir to the Oklahoma communities served by Fort Smith was so small that it would free up only negligible quantities of water for Fort Smith's use. Order on Rehearing, 44 FERC ¶ 61,160 at 61,515–16. The Commission's decision not to explore the alternative of transferring water interstate was justified because NEPA does not require detailed discussion of the environmental effects of remote and speculative alternatives. *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 837–38 (D.C.Cir.1972). FERC's conclusion that only negligible gains could be realized from the reallocation of water from the Tenkiller Reservoir to Oklahoma communities served by Fort Smith was supported by substantial evidence in the record.

■ NEPA does not require the Commission to consider every conceivable alternative in its EIS. Rather, the statute re-quires agencies to consider all reasonable alternatives to proposed actions. We conclude that the Commission satisfied this requirement.

B. *Commission's Use of Data from a "Biased" Party*

■ When the Commission analyzed the costs of the Lee Creek project it used data prepared by an engineering firm employed by Fort Smith. This firm held interests in real estate within the project area which would increase in value if the project were approved. The Commission, aware of this situation, nonetheless used the data in making its licensing determination.

NWF argues that FERC could not properly rely on the information provided by the firm in question without first investigating the accuracy of that information. Because the Commission's approval of the Lee Creek dam project was granted in reliance on this questionable data, NWF argues that FERC's decision should be vacated and that FERC should investigate the validity of the information.

The Commission responds that agency reliance upon information submitted by applicants and other interested parties is inherent in the regulatory process. The Commission argued that it could properly rely on information from a party as long as the information was independently confirmed. The Commission asserts that it has independently confirmed the data in issue.

We reject NWF's contention and find the Commission's use of the evidence in question reasonable. The Commission noted that it was aware of the inherent bias in party-submitted information, but explained that it had independently confirmed the reasonableness of the analyses of the capacities of the project and the estimated construction costs for the project and alternatives. Order on Rehearing, 44 FERC ¶ 61,160 at 61,517. NWF has not pointed to any inaccuracies in the disputed data, but has merely speculated that the data are unreliable due to the interests of the proponents of the evidence. Such a speculation, without more, is insufficient to undermine

**1486**

the Commission's independent determination that the data were reliable.

## VI. CONCLUSION

For the foregoing reasons, we conclude that the Commission's orders issuing Fort Smith a license to undertake the Lee Creek dam project were reasonable and lawful under the FPA, the CWA, and NEPA. We thus deny NWF's petition for review of these orders.