**State of Maine; Great Northern Paper, Inc., Intervenors.**

**Nos. 99–1035, 99–1159, 99–1161 & 99–1162.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 2000.

Decided June 23, 2000.

**CONSERVATION LAW FOUNDATION, et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Sean H. Donahue, Attorney, U.S. Department of Justice, argued the cause for the federal petitioners. With him on the briefs were Lois J. Schiffer, Assistant Attorney General; Peter Coppelman, Acting Assistant Attorney General, James C. Kilbourne, Ellen Durkee, and M. Alice Thurston, Attorneys. Ellen D. Katz, Attorney, entered an appearance.

Carol A. Blasi argued the cause for petitioner Conservation Law Foundation, et al. With her on the briefs was Alexander W. Sierck. Mona M. Janopaul entered an appearance.

Kaighn Smith, Jr. argued the cause for petitioner Penobscot Indian Nation. With him on the briefs was Mark Chavaree.

Beth G. Pacella, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the

brief were John H. Conway, Acting Solicitor, and Timm L. Abendroth, Attorney.

Andrew Ketterer, Attorney General, and Paul Stern, Deputy Attorney General, were on the brief for intervenor State of Maine.

Catherine R. Connors and Matthew D. Manahan were on the brief for intervenor Great Northern Paper, Inc.

Before: RANDOLPH, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Department of the Interior and the Environmental Protection Agency, conservation groups,[1] and the Penobscot Indian Nation petition for review of the Federal Energy Regulatory Commission's relicensing of a hydroelectric project in north-central Maine. The issues presented go mainly to the adequacy of the Commission's consideration of the various factors governing license renewals. Because the Commission gave sufficient attention to these factors and carefully explained its conclusions, the petitions are denied.

I

Located on the West Branch of the Penobscot River, the Ripogenus and Penobscot Mills Hydroelectric Projects produce approximately 108 megawatts of power for Great Northern Paper mills in Millinocket and East Millinocket, Maine. The projects consist of a series of reservoirs, dams, and powerhouses. This case focuses on one of the dams—the 1262 foot long Stone Dam, which is part of the Penobscot Mills Pro-

ject.[2] Constructed in 1899, Stone Dam diverts water through a canal to a 37 megawatt powerhouse. This diversion blocks the main channel of the Penobscot's West Branch for a 4.5 mile stretch known as the "Back Channel." Because of Stone Dam, the Back Channel receives only leakage flows of 2 to 5 cfs (cubic feet per second), except for occasional "spillage" when flows exceed power requirements.

The Penobscot Mills Project, like any project used for the "development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction," requires a license from the Federal Energy Regulatory Commission. 16 U.S.C. § 797(e). When the original license for Penobscot Mills expired at the end of 1993, Great Northern applied for a new one. The Commission issued a Final Environmental Impact Statement analyzing three different proposals regarding the new license: the "Applicant's Proposal," in which Great Northern would "operate the project[ ] nearly as it has over the past 50 years" with some new environmental and recreational enhancements but no increased flows in the Back Channel; "Alternative 1," which reflected the Interior Department's recommendations for enhancements including minimum flows of 350 to 500 cfs in the Back Channel;[3] and "Alternative 2," recommending "enhancement measures intermediate between those proposed by GNP and those in Alternative 1." FEIS at xix. As a baseline for comparison, the Commission adopted the terms and conditions of the existing license as the "no action" option. The impact statement recommended a modified version of Alternative 2 that did not in-

---

1. American Rivers, American Whitewater Affiliation, Appalachian Mountain Club, Conservation Law Foundation, and Trout Unlimited.

2. Petitioners raise no specific objection to the Commission's order relicensing the Ripogenus Project, see 77 F.E.R.C. ¶ 61,316 (1996), though that order was also listed in the petitions for review.

3. Interior initially recommended flows of 500 cfs and later increased the recommendation to 945 cfs. See 85 F.E.R.C. at 62,242 n. 6. In its petition for rehearing before the Commission, however, Interior only "argue[d] for a minimum flow 350 cfs." Id. at 62,242.

clude flow requirements for the Back Channel. *See* FEIS at xxiii.

Shortly after issuance of the final impact statement, the Commission granted a new license for Penobscot Mills.[4] *See* 77 F.E.R.C. ¶ 61,068 (1996). The order conditioned the license on Great Northern's commitment to wetland enhancements, project boundary expansion, and increased flows into Millinocket Stream. *See id.* at 61,275–79. As to the Back Channel, the Commission decided not to order minimum flows "given the modest fisheries benefit likely to occur and the significant adverse impact on the project's energy benefits," *id.* at 61,276, a decision it affirmed on rehearing, *see* 85 F.E.R.C. ¶ 61,316 (1998), and reconsideration, *see* 86 F.E.R.C. ¶ 61,-184 (1999).

## II

■ "In deciding whether to issue any license [for hydroelectric projects,] the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality." 16 U.S.C. § 797(e). The Federal Power Act also requires the Commission to include conditions for the "protection, mitigation and enhancement" of fish and wildlife affected by the project, such conditions to be "based on recommendations received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.) from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies." 16 U.S.C. § 803(j)(1). The Commission retains authority to decide that recommended conditions are "inconsistent with the purposes" of the FPA or other laws, in

which event it shall of course reject them. 16 U.S.C. § 803(j)(2); *see United States Dep't of the Interior v. FERC,* 952 F.2d 538, 544 (D.C.Cir.1992). While the Commission must give "equal consideration" to environmental factors, those factors do not have "preemptive force." 952 F.2d at 545. The Commission "still is charged with determining the 'public interest,' *i.e.,* balancing power and non-power values." *Id.*

The petitioners contend that the Commission's rejection of minimum flow requirements in the Back Channel violates these Federal Power Act provisions and the National Environmental Policy Act, *see* 42 U.S.C. § 4321 *et seq.* Their arguments can be grouped into two categories: that the Commission did not fully recognize the recreational and environmental (*i.e.,* nonpower) benefits that would have resulted if it had imposed minimum flow requirements; and that the Commission inflated the economic costs Great Northern would incur from increased Back Channel flows.

### A. Nonpower Issues

■ The main argument of the federal petitioners is that the Commission should not have treated existing conditions at Stone Dam as the baseline "no action" option because this caused "the Commission to ignore ongoing impacts directly attributable to the new license...." Brief for the Federal Petitioners at 29. We think there is nothing to this objection. The statute—16 U.S.C. § 803(j)—invites a comparative inquiry. It charges the Commission with the duty of protecting, mitigating the damage to, and enhancing "fish and wildlife (including related spawning grounds and habitat) affected by the development, operation and management of the project." To do this properly the Commission must compare what might occur to fish and wildlife if the license does not include protection for nonpower resources against what will occur with conditions im-

---

4. During the interim, the Commission had issued annual renewals of the Penobscot Mills license under the same terms as the expired license. *See* 16 U.S.C. § 808(a).

**46**

posed. The statutory words "fish and wildlife ... affected" by the project seems to refer to the fish and wildlife currently existing in the vicinity of the project, which supports the Commission's choice of existing conditions as a baseline. The quoted language surely cannot refer to the animals inhabiting the area in 1899, when the project came into being. They are long gone and so cannot be "affected" by a Commission licensing decision in the 1990s. Granted, it is possible to treat the words "fish and wildlife" generically, so that it is not just the animals currently residing in the region that get protected or enhanced, but different species that might be introduced or, reintroduced. But this view of § 803(j) does not help petitioners because it says nothing about whether the baseline for the Commission's comparative inquiry should be today or sometime other than today. In other words, even if the statute refers generally to all "fish and wildlife" it hardly follows that the Commission must imagine the Back Channel as it existed before 1899 and assess the effect of relicensing by pretending that Stone Dam does not exist—at least when no one advocates decommissioning the Penobscot Mills Project and tearing down the dam.

Given the language of § 803(j), the Commission certainly had the leeway to conduct its comparative assessments using existing conditions as a baseline. To the reasons just mentioned, we incorporate by reference those given in *American Rivers v. FERC*, 201 F.3d 1186, 1195–99 (9th Cir. 2000), which sustained the Commission's use of an existing conditions baseline as a reasonable construction of § 803(j).

■ In any event, the baseline business has the whiff of a red herring. Baseline or no baseline, the question is whether the Commission has fully examined options calling for greater or lesser environmental protection. Here the Commission spoke of environmental "benefits" and the economic "costs" to Great Northern of options calling for stronger environmental protection. It could just as easily have spoken of economic "benefits" to Great Northern from licensing the project and environmental "costs." So long as the Commission adequately examines both the power and nonpower impacts of recommended licensing conditions, we do not see why it matters on which side of the equation environmental concerns are placed. In issuing the new licenses in these proceedings, the Commission adopted twelve of Interior's fourteen recommended environmental enhancements while using an existing conditions baseline. *See* FEIS tbls.5–8 to 5–9, at 5–20 to 5–21, *adopted at* 77 F.E.R.C. at 61,275. This in itself proves that the federal petitioners are mistaken in thinking that an existing conditions baseline preordains the rejection of any new conditions for the protection of fish and wildlife. So long as the Commission examines options that include recommended environmental enhancements, its choice of a baseline will not prevent it from giving "equal consideration" to nonpower values.[5]

■ Petitioners also argue that the Commission did not give "equal consideration" to nonpower values because it refused to assess in economic terms the nonpower benefits that would result from restoring significant flows to the Back Channel. Restored flows, petitioners believe, would attract anglers and whitewater rafting enthusiasts to this 4.5 mile stretch of river. In the rehearing order, the Commission explained its refusal to quantify these nonpower benefits: "[T]he public-interest balancing of environmental and economic impacts cannot be done with mathematical precision, nor do we think our statutory obligation to weigh and balance all public interest considerations is served by trying to reduce it to a mere mathematical exercise.... [F]or nonpower resources such as aquatic habitat,

---

5. We also agree with the *American Rivers* court, *see* 201 F.3d at 1199–2001, that the Commission's thorough examination of a range of licensing alternatives satisfies NEPA's procedural requirements, *see* 42 U.S.C. § 4332(2)(C)(iii).

fish and wildlife, recreations, and cultural and aesthetic values, to name just a few, the public interest cannot be evaluated adequately only by dollars and cents." 85 F.E.R.C. at 62,244–45. Certainly nothing in the statute requires the Commission to place a dollar value on nonpower benefits. Nor does the fact that the Commission assigned dollar figures to Great Northern's economic costs require that the Commission do the same for nonpower benefits: " 'Equal consideration' is not the same as 'equal treatment.' " *State of California v. FERC,* 966 F.2d 1541, 1550 (9th Cir.1992). The refusal to quantify nonpower benefits did not "stack the deck" against those concerns. The Commission approved "a variety of enhancements related to instream flows for fisheries and recreation, stabilization of impoundment levels, wetlands, recreational facilities, shoreline protection, and cultural resources." 85 F.E.R.C. at 62,245; *see also id.* at 62,245 n. 31. A critical factor in the Commission's refusal to impose minimum flows was the increased power expenses that would result, not the Commission's failure to appreciate nonpower values. Minimum flows of 350 cfs in the Back Channel would, the Commission concluded, increase annual power expenses by $916,300; the *total* increase in annual power costs of the enhancements the Commission approved for Penobscot Mills was $262,600. *See* FEIS tbl.5–3, at 5–13.

■ Petitioners' final complaint under this heading is that the Commission did not focus on the possibility of a brook trout[6] fishery in the Back Channel. In its original order, the Commission observed that "fish species such as brook trout, eels, minnows and suckers would benefit slight-

ly from the recommended flows, [but] the Back Channel would at best only produce several hundred adult land-locked salmon." 77 F.E.R.C. at 61,275. The order then explained why the Back Channel would not be a desirable habitat for land-locked salmon, but did not mention brook trout again. *See id.* On rehearing, the Commission stated that there was "a low likelihood of re-establishing limited habitat" for brook trout. 85 F.E.R.C. at 62,243. It relied, at least in part, on "a Maine Department of Inland Fish and Wildlife priority to maintain and protect fishery resources elsewhere in the project area." *Id.* "During dry years, requiring minimum flows above leakage in the Back Channel could affect the ability to maintain constant flows in the West Branch and Millinocket Stream, and lake level in the North Twin reservoir, which could cause stress and potential damage to salmon and trout populations in those areas." *Id.* Given the plentiful brook trout fisheries in the Penobscot Mills–Ripogenus area, the Commission cannot be faulted for believing that adding another 4.5 mile stretch would have little benefit. *See id.*

■ The Federal Power Act requires the Commission to consider the recommendations of the United States Fish and Wildlife Service and State fish and wildlife agencies.[7] *See* 16 U.S.C. § 803(j)(1). Even when the recommendations of federal and state agencies are in concert, those agencies do not have "veto power" over Commission licensing decisions. *Department of Interior,* 952 F.2d at 545 (citing *National Wildlife Fed'n v. FERC,* 912 F.2d 1471, 1480 (D.C.Cir.1990)). In this case the federal and State agencies disa-

---

**6.** A "brook trout" (*Salvelinus fontinalis*) is actually a char. "Chars are distinguished from trout by their mouth structure; the vomerine bone in the center of a trout's mouth has teeth all along it, while the vomer of the char has only a few teeth on the front end of the bone." A.J. McClane, ed., McClane's New Standard Fishing Encyclopedia and International Angling Guide 207 (1998 ed.).

**7.** The same provision requires the Commission to "attempt to resolve any inconsistency" between its proposed license and other agency recommendations. *See* 16 U.S.C. § 803(j)(2). The Commission did so in a "dispute-resolution meeting with representatives from Interior on February 8, 1996." 77 F.E.R.C. at 61,274.

greed about the desirability of promoting a brook trout fishery in the Back Channel. The Commission adequately explained why Interior's recommendation was inconsistent with the purposes of the FPA. *See* 16 U.S.C. § 803(j)(2). Not only would Interior's proposal curtail power production from the Penobscot Mills Project, but the Commission had reason to believe a Back Channel brook trout fishery would actually do more harm than good to the region's fish habitats.

## B. Power Issues

■ The Commission stated that the "reduction in the project's ... annual energy benefits for the Back Channel flows outweighs the enhancement in aquatic resources that the flows would produce." 77 F.E.R.C. at 61,276. The Commission calculated this annual reduction as $916,000[8] (6% of the project's total benefits), *see id.*, based on the price of purchasing replacement power from the least-cost alternative source—Bangor Hydro & Electric Company,[9] *see* FEIS § 2.4.4, at 2–33 to 2–34.

Petitioners complain that the Commission failed to consider the alternative of Great Northern conserving energy, something the statute requires the Commission to consider. *See* 16 U.S.C. §§ 797(e), 808(a)(2)(C); *see also* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14. They put it this way: "By considering conserved power as the least cost alternative to hydropower, rather than the more expensive purchased power used by the Commission, the cost of environmental enhancements, such as Back Channel flows, are much lower." Final Brief for Petitioners Conservation Law Foundation, et al. and Trout Unlimited at 12. But the Commission did

consider the alternative of energy conservation. After examining Great Northern's plant data, the Commission concluded that the mills had recently increased energy efficiency as the result of plant modernization efforts and the use of steam generation and that no reliable evidence supported petitioners' view that "enormous conserved power potential" still existed at the mills. *See* FEIS E–3, *cited in* 77 F.E.R.C. at 61,269 n. 16; *id.* at E–24. The final impact statement also noted that Great Northern, "operating as a private for-profit enterprise, would have a strong economic incentive to maximize savings from conservation and not waste electric power, particularly as it manufactures an energy-intensive product." *Id.* at E–23, *cited in* 85 F.E.R.C. at 62,243 n. 14. Any conservation that did occur would be "used to displace higher cost fossil fuel power ... [s]ince the entire output from the two projects supplies only a portion of GNP's total annual power needs...." *Id.*, *cited in* 85 F.E.R.C. at 62,243 n. 14. We see no ground for disagreeing with this reasoning. The Penobscot Mills (31% of energy needs) and Ripogenus (19% of energy needs) Projects supply only half of the energy needed for Great Northern's paper manufacturing. *See* 77 F.E.R.C. at 61,242, 61,270. Until the company's conservation measures achieved a 50% reduction in its energy needs (something no one contends is likely), the consequence of increased energy efficiency would be a decrease in the company's purchase of other, more expensive, sources of power. Thus, the "replacement cost" of reduced hydroelectric power would still be the price of power from Bangor, namely $916,000.[10]

---

**8.** The Commission concluded that the annual cost of Interior's request for 950 cfs would be $2.5 million, or 16% of the project's power production. *See* 77 F.E.R.C. at 61,274–75.

**9.** The Commission (as well as the parties) assume that Great Northern would purchase fossil fuel power—not hydro power—from Bangor.

**10.** Although conservation would not change the $916,000 replacement cost of increased Back Channel flows, it would reduce Great Northern's total energy costs. But it was the magnitude of the replacement cost, not the impact it would have on the company's overall economic condition, that led the Commission to reject the proposal for increased Back Channel flows. *See infra* note 11.

■ Petitioners' other cost-side argument is that the Commission relied on unsupported claims that the increased cost of Back Channel flows would result in job losses at the Great Northern mills. This misinterprets the Commission decision. In the original order, the Commission recognized "Great Northern's need for inexpensive power to remain competitive in its paper making operations." 77 F.E.R.C. at 61,275. Then, in a footnote, the Commission stated that it could not verify the company's claim that flows in the Back Channel "would result in the loss of approximately 238 jobs," so the Commission was just relying on what it did know—that "Great Northern's operating costs are high compared to other paper manufacturers, and cost increases *could* reduce the company's competitiveness." *Id.* at 61,275 n. 31 (italics added). On rehearing, the Commission once again indicated that it was only relying on the *risk* of economic harm: "A 350–cfs minimum flow would reduce the annual energy benefit of Penobscot Mills substantially, with the *possibility* of causing Great Northern to further curtail operations at, or close, its paper mills . . . ." 85 F.E.R.C. at 62,242 (italics added) (footnotes omitted). There is ample evidence in the record to support the Commission's findings. Papermaking is a highly competitive industry, *see* FEIS § 5.3.5, at 5–14, *cited in* 77 F.E.R.C. at 61,275 n. 31; Great Northern is a high cost producer compared to other paper manufacturers,

*see id., cited in* 77 F.E.R.C. at 61,275 n. 31, and Great Northern recently closed some Millinocket facilities, resulting in the elimination of about 350 jobs, *see* 85 F.E.R.C. at 62,242 n. 9.[11]

### III

The Penobscot River Basin is "home to the Penobscot Indian Nation (PIN), much of whose cultural heritage is closely associated with the river and the resources it provides." FEIS § 3–1, at 3–1. Under the Maine Indian Claims Settlement Act, the " 'Penobscot Indian Reservation' " is defined as "the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818 . . . ." 25 U.S.C. § 1722(i) (incorporating 30 ME. REV.STAT. ANN. § 6203(8)). The Penobscot Nation claims that its reservation includes the islands in the West Branch of the Penobscot. The State of Maine disagrees, contending that nothing "even remotely suggests that any land or islands in any branches or tributaries of the Penobscot River were being reserved" to the Tribe. FEIS § 4.11.1.2, at 4–69.

■ The land issue is of some consequence to this case. The Tribe believes it should have been a consulting party to the

11. Petitioners' pre-argument motion to remand the case to the Commission for the taking of additional evidence, *see* 16 U.S.C. § 825*l*(b), is denied. In November 1999, Great Northern Paper submitted an application to the Commission seeking the transfer of the Penobscot Mills license to a new subsidiary, Great Northern Energy. A subsidiary of Duke Energy Corporation has a minority interest in Great Northern Energy. Petitioners believe these developments affect two of the Commission findings: that Back Channel flows could threaten the mills' economic viability and that expanded conservation efforts are not plausible. We do not see, however, how these developments could alter the two dominant factors in the Commission's decision: the replacement energy cost of

$916,000 and the minimal (perhaps even detrimental) effect on fisheries. *See* 77 F.E.R.C. at 61,275 ("Interior's recommendations … would entail a significant reduction in energy benefits on behalf of only marginal improvements to aquatic habitat. . . ."); *id.* at 61,276 ("Given the modest fisheries benefit likely to occur and the significant adverse impact on the project's energy benefits, we are not requiring minimum flows for the Back Channel."). It does not "clearly appear that the new evidence would compel or persuade to a contrary result," so we deny the motion. *Friends of the River v. FERC,* 720 F.2d 93, 99 n. 6 (D.C.Cir.1983) (quoting *Rocky Mountain Power Co. v. Federal Power Com'n,* 409 F.2d 1122, 1128 n. 21 (D.C.Cir.1969)).

"programmatic agreement" the Commission adopted in fulfilling its duty to take "into account the effect of [the licenses on any site] that is included in or eligible for inclusion in the National Register" of Historic Places. 16 U.S.C. § 470f; *see also* 36 C.F.R. § 800.13 (authorizing agencies to delegate this responsibility to "programmatic agreements"). An Indian Tribe must be named a concurring party to a programmatic agreement when the agency "undertaking will affect Indian lands." 36 C.F.R. § 800.1(c)(2)(iii). But the Penobscot Nation had not established legal title to the islands in the West Branch, and so the Commission did not confer consulting party status on it. *See* 85 F.E.R.C. at 62,245. The Commission made clear on rehearing that it was not determining the merits of the Tribe's land claims and that, should the Tribe establish legal title to the lands, it would be added as a consulting party. *See id.* at 62,245 & n. 35. We agree that the Commission was under no obligation to make the Penobscot Nation a consulting party; nor was its failure to do so an abuse of discretion.

The Tribe also contends that increased flows in the Back Channel would provide its members with canoe access to religious sites, which means that the Commission violated the American Indian Religious Freedom Act. This statute requires the "United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ... including but not limited to access to sites...." 42 U.S.C. § 1996. The Commission's response is conclusive: even with flows of 350 cfs, canoe navigation of the Back Channel would not be possible. *See* 77 F.E.R.C. at 61,275 n. 39. The Commission also noted that "there is a nearby canoe route on the Penobscot that permits canoe passage to the same sites"—presumably the route the Tribe

12. The Tribe raises several other arguments that do not warrant written exposition.

has used since 1899. *See* 85 F.E.R.C. at 62,243. Federal agencies are to consider, "but not necessarily to defer to, Indian religious values." *Wilson v. Block,* 708 F.2d 735, 747 (D.C.Cir.1983). The Commission has performed its duty under this legislation. [12]

*The petitions for review are denied.*

These have been considered and rejected.