47 F.3d 1186
 310 U.S.App.D.C. 312
 SHELL OIL COMPANY; Shell Pipe Line Corporation, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Pennzoil Exploration and Production Company, et al., Intervenors.
PENNZOIL EXPLORATION AND PRODUCTION COMPANY, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Shell Oil Company; Shell Pipe Line Corporation, Intervenors.
 Nos. 92-1634, 93-1762.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 28, 1994.
Decided Feb. 21, 1995.
 
 Petitions for Review of an Order of the Federal Energy Regulatory Commission.
 Lawrence A. Miller, Washington, DC, argued the cause, for petitioners Shell Oil Co., et al. With him on the briefs was Kevin Hawley, Washington, DC.
 John W. Ebert, Washington, DC, argued the cause, for petitioners Pennzoil Production Co., et al. With him on the briefs were Mark F. Sundback and Peter J. Thompson, Washington, DC.
 Eric Lee Christensen, Atty., F.E.R.C., Washington, DC, argued the cause, for respondent. With him on the briefs were Anne K. Bingaman, Asst. Atty. Gen., John J. Powers, III and Robert Wiggers, Attys., U.S. Dept. of Justice, Jerome M. Feit, Sol., Joseph J. Davies, Deputy Sol., and Timm L. Abendroth, Atty., F.E.R.C., Washington, DC.
 Kevin Hawley, Washington, DC, argued the cause, for intervenors Shell Oil Co., et al. With him on the brief was Lawrence A. Miller, Washington, DC. John W. Ebert, Mark F. Sundback and Peter J. Thompson, Washington, DC, were on the brief, for intervenor Pennzoil Exploration and Production Co., et al.
 Before: WILLIAMS, GINSBURG, and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROGERS.
 ROGERS, Circuit Judge:
 
 
 1
 Petitioners in these consolidated cases challenge an order of the Federal Energy Regulatory Commission concerning access to an oil pipeline system on the Outer Continental Shelf. Applying the "open and nondiscriminatory access" provision of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. Sec. 1334(f) (1988), the Commission ruled that the Bonito Pipe Line Company must provide Shell Oil Company with access and transportation service on its pipeline. Petitioner Pennzoil Exploration and Production Company,[1] which operates the Bonito pipeline, challenges this portion of the Commission's order. We hold that the court has jurisdiction over Pennzoil's case, which was transferred from the United States District Court for the Eastern District of Louisiana, and that requiring the Bonito pipeline to grant Shell access was consistent with the relevant statute, neither arbitrary nor capricious, and procedurally proper. Accordingly, we deny Pennzoil's petition (No. 93-1762).
 
 
 2
 The Commission also ruled that it lacks jurisdiction to enforce the Interstate Commerce Act ("ICA") with respect to oil pipelines located wholly on the OCS. Petitioners Shell Oil Company and Shell Pipe Line Corporation ("Shell") contest the Commission's disclaimer of ICA jurisdiction despite having prevailed in obtaining access to the Bonito pipeline under Sec. 5(f) of the OCSLA. Because we conclude that Shell has not yet demonstrated aggrievement or the likelihood of imminent injury under the Commission's order and therefore lacks standing, we dismiss Shell's petition (No. 92-1634) without prejudice and without reaching the merits of the Commission's decision that it lacks jurisdiction under the ICA.
 
 
 3
 In Part I of this opinion we outline how the petitions came before the court. In Part II we address Shell's challenge to our jurisdiction to consider Pennzoil's petition and our decision to retain jurisdiction over the transferred case, as well as the merits of Pennzoil's claims under the OCSLA. In Part III we address Shell's standing to challenge the Commission's ruling disclaiming ICA jurisdiction.
 
 I. BACKGROUND
 
 4
 The Bonito pipeline system extends for 71 miles entirely on the Outer Continental Shelf ("OCS") in the Gulf of Mexico. Bonito is owned in part and operated by a subsidiary of petitioner Pennzoil.[2] The pipeline terminates at an offshore connection with the Ship Shoal pipeline system, which transports crude oil from Bonito and two other pipelines to distribution points and refineries onshore in the State of Louisiana. Ship Shoal is owned in part and operated by petitioner Shell Pipe Line Corporation.
 
 
 5
 In the early 1990s, Shell developed a new production facility on the OCS, known as the Auger Unit. Seeking to transport the Auger crude oil to points onshore, Shell constructed a 70-mile pipeline from the new wellhead to an interconnection point with the Bonito pipeline. Pennzoil, however, refused Shell's request to connect with the Bonito pipeline, claiming that the Auger crude's high sulfur content would degrade the average quality of Bonito-transported oil to the detriment of Bonito's present users.[3] Pennzoil then petitioned the Commission for a declaratory order that the Bonito pipeline was not required to transport the "sour" Auger crude. Shell intervened in the proceeding and opposed Pennzoil's petition, citing nondiscriminatory access provisions of both the OCSLA and the ICA. The Commission issued the order under review on October 8, 1992. Bonito Pipe Line Company, 61 FERC p 61,050 (1992) ("Order").
 
 
 6
 The Commission ruled that Pennzoil was required to grant Shell access to the pipeline under the "open and nondiscriminatory access" requirement of Sec. 5(f) of the OCSLA. Id. at p. 61,222-25; 43 U.S.C. Sec. 1334(f). With respect to Shell's claims under the ICA, however, the Commission ruled that the ICA does not apply to OCS oil pipelines that lie entirely on the OCS, and that the Commission therefore lacked jurisdiction to enforce the ICA against Bonito.[4] Hence, while the Bonito pipeline remained subject to the nondiscrimination provisions of the OCSLA, it was not bound by the rate reasonableness, nondiscrimination, or tariff filing provisions of the ICA.[5] See id. at p. 62,221; see also Oxy Pipeline, Inc., 61 FERC p 61,051 (1992) (companion case issued the same day) (intra-OCS pipelines "need not comply with any of the requirements of the ICA with respect to their facilities on or across the [OCS]").
 
 
 7
 On December 7, 1992, Shell filed a petition for review in this court, challenging the Commission's disclaimer of ICA jurisdiction. Shell maintains that the Commission misread the scope of the ICA and that the denial of extra protection under that statute has caused Shell injury in fact despite its success in gaining access to the Bonito pipeline on alternative grounds. Pennzoil intervened, arguing that Shell lacks standing and that the Commission properly interpreted the ICA.
 
 
 8
 Meanwhile, in a separate proceeding commenced on February 12, 1993, in the United States District Court for the Eastern District of Louisiana, Pennzoil contested the portion of the Order granting Shell access to the Bonito pipeline under the OCSLA.[6] The district court ruled that it had original jurisdiction over Pennzoil's petition under the OCSLA, but nevertheless acknowledged the close connection between the separate claims filed by Shell and Pennzoil. After initially staying Pennzoil's case pending this court's decision on Shell's standing, the district court transferred Pennzoil's case to this court on November 3, 1993, in order "to avoid bifurcation of the issues in this case and unnecessary and duplicative litigation."[7]
 
 
 9
 As an intervenor in Pennzoil's petition, Shell contends that the petition should be dismissed because Pennzoil failed to file timely in the proper court and, alternatively, that the Commission correctly applied the open and nondiscriminatory access provisions of the OCSLA. Because our view of Shell's standing depends on a resolution of Pennzoil's OCSLA contentions, we begin our analysis with Pennzoil's petition.
 
 II. PENNZOIL'S OCSLA CONTENTIONS
 
 10
 A. Subject-Matter Jurisdiction. We first address whether this court has subject-matter jurisdiction over the OCSLA claims presented by Pennzoil. The parties disagree about which statute governs the procedures for judicial review of Commission orders concerning OCS oil pipelines. Shell and the Commission contend that jurisdiction over Pennzoil's case is controlled by the Hobbs Act, which requires that a petition be filed with a court of appeals.[8] If Shell is correct, we must dismiss Pennzoil's petition for failure to file timely in the proper court. Pennzoil, however, maintains that the OCSLA provides the applicable judicial review procedures, and that its action was properly filed in the district court. We conclude that the OCSLA conferred original jurisdiction on the district court and that Pennzoil's filing was therefore timely. Applying principles adopted by the Seventh Circuit and this court, we also conclude that this court should retain jurisdiction over the transferred case notwithstanding the fact that the district court had original jurisdiction.
 
 
 11
 1. District Court Jurisdiction. Pennzoil's position, which the district court also adopted, is that jurisdiction to hear its challenge is governed by the judicial review procedures contained in the OCSLA. Section 23(a) of the OCSLA provides that "all suits challenging actions or decisions allegedly in violation of, or seeking enforcement of, the provisions of this subchapter ... shall be undertaken in accordance with the procedure described in this subsection." 43 U.S.C. Sec. 1349(a)(6) (emphases added). Section 23(b)(1) further provides that federal "district courts ... shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the [OCS] which involves exploration, development, or production of [OCS] minerals." Id. Sec. 1349(b)(1). In addition, the OCSLA defines the term "production" to include "transfer of minerals to shore," id. Sec. 1331(m), and the term "minerals" is defined to include "oil." Id. Sec. 1331(q). The only exceptions to district court review are specified in the statute, which provides that judicial review of decisions with respect to leasing, exploration, development or production plans shall take place only in the courts of appeals, see 43 U.S.C. Sec. 1349(c), and those provisions are irrelevant to Pennzoil's challenge. We therefore agree that Pennzoil's challenge to the Commission's decision with respect to the access and shipment of oil on OCS pipelines falls within the jurisdictional provisions of Sec. 23(b).[9]
 
 
 12
 However sensible the policy objectives in favor of immediate appellate review, see infra note 20, the OCSLA provides a separate route for judicial review of the Commission's order. Moreover, unlike review of the Federal Communications Commission action at issue in Bywater Neighborhood Ass'n v. Tricarico, 879 F.2d 165 (5th Cir.1989), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 474 (1990), on which Shell relies, judicial review of decisions of the Federal Energy Regulatory Commission is not clearly and exclusively committed to the courts of appeals. Instead, procedures for judicial review of Commission decisions vary depending on the statutory authority under which the challenged order was issued. The order challenged here was issued under the OCSLA, and, as Pennzoil points out, the OCSLA expressly provides for judicial review in the district courts.
 
 
 13
 Shell's contrary position, that the Hobbs Act confers exclusive jurisdiction on the courts of appeals to review all Commission orders concerning oil pipelines, is unpersuasive. Shell's argument, which the Commission also espouses,[10] is that the judicial review provisions of the Hobbs Act were made applicable to Commission orders in 1977 under the Department of Energy Organization Act ("DOE Act"), 42 U.S.C. Secs. 7101 et seq. (1988), Pub.L. No. 95-91, 91 Stat. 565 (1977). That statute created the Department of Energy and transferred regulatory authority to it from a variety of different agencies. See 42 U.S.C. Secs. 7151-7159. The Commission, as part of the new Department, received some of its authority from the Interstate Commerce Commission ("ICC"), including specified regulatory responsibilities over oil pipelines.[11] At the time of the DOE Act's enactment, the ICC's only OCSLA-derived authority empowered it to determine the "proportionate amounts" of oil required to be transported on OCS pipelines. See 43 U.S.C. Sec. 1334(c) (1976).[12] Under the interpretation urged by Shell and the Commission, the DOE Act transferred this function to the Commission as well.
 
 
 14
 Shell and the Commission further maintain that under the DOE Act, Commission functions previously performed by the ICC are reviewable in the same manner as if they were orders of the ICC itself. Because, they argue, all ICC functions relating to oil pipelines were transferred to the Commission, and the Hobbs Act indisputably governs judicial review of ICC orders, see 28 U.S.C. Secs. 2321, 2342, Shell and the Commission conclude that every Commission order concerning oil pipelines is subject to review under the Hobbs Act.[13] Thus, Shell maintains that Pennzoil went to the wrong court when it filed its petition in the district court in Louisiana, that the subsequent transfer was invalid because Pennzoil failed to file its appeal within 60 days of the Order as required by the Hobbs Act,[14] and that Pennzoil's petition must be dismissed.
 
 
 15
 This argument is unconvincing. Even an expansive view of the ICC functions captured by the DOE Act[15] would flounder on reaching the Commission's exercise of authority under OSCLA Sec. 5(f), which was enacted one year after the DOE Act was passed. See H.R.CONF.REP. NO. 1474, 95th Cong., 2d Sess. 87 (1978), reprinted in 1978 U.S.C.C.A.N. 1450, 1674, 1686 (noting that "[s]ubsection (f) ... is a reaffirmation and strengthening of subsection 5(e)"). The statutory authority derived from Sec. 5(f) was vested in the first instance in the Commission. To the extent that the Order was issued pursuant to Sec. 5(f) authority, therefore, it can hardly be reviewed as if it had been issued by the ICC. Cf. Owner-Operator Indep. Drivers Ass'n, Inc. v. Pena, 996 F.2d 338, 340-41 (D.C.Cir.1993) (holding Hobbs Act did not apply where "the direct source of the Secretary [of Transportation's] authority ... cannot be traced to powers exercised by the ICC" prior to their transfer to the newly created agency).
 
 
 16
 In any event, even if all of the OCSLA functions relating to oil pipelines can be retroactively imputed to the ICC--making Sec. 5(f) subject to the DOE Act provision on judicial review--the DOE Act provides that judicial review is to be determined according to the substantive law pursuant to which the challenged order was issued. Section 502(a) of the DOE Act provides:
 
 
 17
 Judicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the [Energy Department] ... shall, notwithstanding such vesting, transfer, or delegation, be made in the manner specified in or for such law.
 
 
 18
 42 U.S.C. Sec. 7192(a) (emphasis added). Consequently, the court must look to the law under which the Commission issued the Order, and not to the agency that initially exercised that function.[16] The Commission derives its jurisdiction from a variety of statutory sources, including authority directly assigned to the Commission by statute. In the instant case, the Order was issued pursuant to the Commission's authority under the OCSLA. Thus, even if Shell is correct that the DOE Act governs all activity of the Federal Energy Regulatory Commission over all oil pipelines, the court would look to the judicial review provisions "specified in or for" the OCSLA itself. Consequently, because the OCSLA provides for original jurisdiction in the district courts, Pennzoil properly filed its case in the Eastern District of Louisiana, and that court had jurisdiction over the case when it issued the transfer order.
 
 
 19
 2. The Transfer to this Court. The question remains whether this court should retain jurisdiction over Pennzoil's petition in light of our conclusion that the district court had original jurisdiction.[17] The district court transferred Pennzoil's case due to its close relationship with Shell's pending petition in this court.[18] Our exclusive jurisdiction to review the petition filed by Shell, which contests the Commission's determination of its authority under the ICA, is undisputed. See 28 U.S.C. Secs. 2321, 2342. The court is thus presented with two petitions challenging different rulings in the same order, but which followed different routes for judicial review.
 
 
 20
 The Seventh Circuit has held that "when an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court." Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 192 (7th Cir.), cert. denied, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986). This court has cited Suburban O'Hare with approval, observing that where a district court has exclusive original jurisdiction over one of two statutory bases for an order under review, "the interests of assuring a forum capable of treating the case coherently might justify the comparatively modest displacement of the district court." International Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1482 (D.C.Cir.1994) (dictum). The agency action in Suburban O'Hare was challenged by a single petitioner and involved four related orders, one of which led to initial review in the district court. Although the instant case involves separate petitioners seeking review of two distinct rulings in a single declaratory order, the principle that underlies Suburban O'Hare is equally applicable here: where an agency order arising from a common factual background and addressing a common question of law relies on two statutory bases that give rise to separate paths for judicial review, the entire order should be reviewed in a comprehensive and coherent fashion, and that review should take place in the court of appeals.[19] Here, Pennzoil challenges the same order as Shell, basing its attack on the grounds that the Commission erred in its statutory interpretation and lacked substantial evidence on the record to support its decision. As Suburban O'Hare and International Brotherhood recognized, a district court offers no advantages over a court of appeals with respect to on-the-record review of completed administrative proceedings, while a bifurcated approach might lead to confusion and unnecessary duplication.[20] In addition, the petitions of Pennzoil and Shell are legally interdependent because Shell's standing may turn on the merits of Pennzoil's case. Under these circumstances, our decision to consolidate Pennzoil's action with Shell's petition was reasonable and appropriate.[21]
 
 
 21
 The fact that we dismiss Shell's petition for lack of standing does not change that analysis. See infra Part III. As the district court recognized in transferring Pennzoil's case, resolution of Pennzoil's claims is a necessary predicate to an analysis of Shell's standing to challenge the Commission's denial of ICA jurisdiction.[22] If the Commission erred in requiring the Bonito pipeline to provide transportation service to Shell under the OCSLA, then Shell's standing to challenge the disclaimer of the alternative statutory basis for access to Bonito would obviously be affected. Shell's standing thus depends in part on the outcome of the OCSLA proceeding, and the two petitions should logically be decided in sequence, with consideration given first to the merits of Pennzoil's challenge.
 
 
 22
 In theory, this court could require that Pennzoil's case proceed in the district court prior to our consideration of Shell's standing. But such a route would not serve the interests of judicial economy, as the district court's transfer order recognized, particularly now that the merits of Pennzoil's OCSLA claims have been briefed and argued here. This court has informed itself of the issues, and our rejection of the transfer would waste judicial resources, cause inconvenience and expense to the parties, and delay other litigants awaiting judicial attention in the Eastern District of Louisiana (and perhaps the United States Court of Appeals for the Fifth Circuit as well). Cf. Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 837, 109 S.Ct. 2218, 2225, 104 L.Ed.2d 893 (1989) ("[B]ecause 'law is an instrument of governance rather than a hymn to intellectual beauty, some consideration must be given to practicalities.' ") (quoting Newman-Green, Inc. v. Alfonzo-Larrain, 854 F.2d 916, 925 (7th Cir.1988), rev'd on other grounds, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989)). Neither party seeks such an alternative to consolidation of the petitions in this court. In light of these considerations, we retain jurisdiction over Pennzoil's petition.
 
 
 23
 B. The OCSLA Claims. Pennzoil contends that the Order improperly required the Bonito pipeline to provide open and nondiscriminatory access to Shell under the OCSLA. The Commission, acting under its OCSLA authority, see 43 U.S.C. Sec. 1334(e)-(f), concluded that Bonito's refusal of Shell's request constituted discrimination under the Act, and accordingly required Bonito to transport Shell's Auger crude oil. See Order, 61 FERC at p. 61,222-23. The Commission also denied Bonito's request that the Auger crude be allocated among other available pipelines in the vicinity of the new production, and it rejected the claim that Bonito's existing shippers held any legally cognizable right to Bonito's "sweet crude upgrade." Id. at p. 61,222-25. We hold that the Order reasonably interpreted and applied the statute.
 
 
 24
 The "sweet crude upgrade" results from the fact that the Bonito pipeline operates as a common stream system, commingling crude from the various producers that transport oil on the pipeline. Because highly sulfuric crude is more expensive to refine, the crude oil market distinguishes between "sweet" crude, which contains less than 0.5 percent sulfur and commands a premium price, and all other crude sources, which are considered "sour." Id. at p. 61,219. Although Bonito runs sour, with an average sulfur content ranging from 0.67 percent to 0.79 percent, it commingles with a sweet stream at the Ship Shoal interconnection. Ship Shoal's common stream has historically run sweet (at 0.41 percent sulfur), notwithstanding the addition of the Bonito sour stream. Id. at p. 61,219. The connection with Ship Shoal has consequently allowed Bonito shippers to collect a sweet market price for their share of the commingled Ship Shoal stream onshore, even though their own crude may be sour at the wellhead. Because Shell's Auger crude contains approximately 1.0 percent sulfur, however, its addition to the Bonito common stream would threaten the sweetness of the Ship Shoal common stream. Bonito shippers therefore feared that Ship Shoal would reject the downgraded Bonito stream, id., and Pennzoil accordingly refused Shell's attempt to connect with Bonito.
 
 
 25
 In ruling that Bonito's rejection of the Auger crude constituted discrimination, the Commission focused solely on conditions on the Bonito line. The Commission stated in its Order that the Bonito common stream was itself sour, that "a portion of the crude oil already transported by Bonito has a sulfur content at or near 1.0 percent," and that "Bonito cannot legitimately argue that Shell's volumes are so different from the common stream already being transported that they will materially affect the current quality of the stream." Id. at p. 61,222. In particular, the Commission noted that Bonito had accepted shipments from one of its owners, Chevron Pipe Line, with a sulfur content of 0.91 percent--shipments that amounted to more than one-half of the pipeline's current throughput--and that the Auger shipments were similarly situated for purposes of discrimination under the OCSLA. Id. at p. 61,223.
 
 
 26
 The Commission rejected Bonito's attempt to distinguish the Chevron volumes. Bonito argued, and Pennzoil continues to maintain, that unlike the Auger crude, the Chevron crude had been accepted in advance by the Ship Shoal pipeline downstream and did not threaten to push Ship Shoal's common stream over the 0.5 percent sweet crude threshold. In the Commission's view, however, "[a]pproval or lack thereof on the part of Ship Shoal is irrelevant to the Bonito owners' statutory duty to transport crude oil on Bonito's system in a nondiscriminatory fashion." Id. The Commission's approach thus focused only on the common stream of Bonito itself, regardless of the consequences for the downstream "sweet crude upgrade" on Ship Shoal's system. The Commission dismissed that benefit as "a windfall" without consequence for its discrimination analysis: "The fact that [Bonito shippers] have benefitted from a higher price ... than they would have received had they sold it at the wellhead does not override Bonito's obligation to avoid discrimination against a similarly situated shipper." Id. at p. 61,222.[23]
 
 
 27
 Finally, the Commission dismissed Pennzoil's argument that alternative pipelines are available for the Auger crude. Because Bonito's duties under the OCSLA stand on their own, the Commission stated, "[t]he possible availability of other transportation in the area does not relieve Bonito of its obligation to accept Shell's volumes." Id. at p. 61,224. In addition, the Commission ruled that Bonito had excess capacity sufficient to accommodate the maximum projected Auger crude production of 50,000 barrels per day.[24] Id. It therefore refused to consider a request, which it described as "premature," for an allocation methodology for either the Bonito system alone or for all pipelines in the vicinity. Id. at p. 61,225.
 
 
 28
 The court reviews the Order pursuant to the deferential standard of Sec. 706 of the Administrative Procedure Act, which instructs that a court must uphold a final agency action unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1988). Because the Commission administers and enforces the relevant provisions of the OCSLA, the court defers to its "permissible construction" of that statute provided that Congress has not "directly spoken to the question at issue." See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984); National Wildlife Federation v. FERC, 912 F.2d 1471, 1482-83 (D.C.Cir.1990). Consistent with this deferential standard of review, we find no basis on which to conclude that the Order is, as Pennzoil contends, arbitrary and capricious, contrary to express provisions of the OCSLA, or contrary to past Commission policy.[25]
 
 
 29
 Underpinning several of Pennzoil's arguments is the claim that the Commission gave insufficient consideration to the possible loss of the "sweet crude upgrade." Yet the Commission clearly recognized the possibility that the upgrade might be lost, but it ruled that loss legally insignificant for purposes of determining Bonito's obligations under the OCSLA.[26] The Commission concluded that Bonito has "no legal basis for [its] claim that [it is] entitled to continue to receive the benefit of the upgrade on the Ship Shoal system." Order, 61 FERC at p. 61,224. Although Pennzoil objects to the inequities that it says will flow from the Order, it cites no authority for the proposition that the "sweet crude upgrade" constitutes a legally cognizable interest that the Commission must protect.[27] Hence, we uphold the Commission's decision to disregard any disadvantages caused by the possible impairment of Bonito's "sweet crude upgrade."
 
 
 30
 Similarly, we reject Pennzoil's related argument disputing the Commission's conclusion that "Bonito's refusal to accept and transport the Auger volumes constitutes discrimination that is prohibited by the OCSLA." Id. at p. 61,222. According to Pennzoil, the Commission's conclusion that volumes previously or currently transported on Bonito's system were indistinguishable from the Auger crude oil conflicts with substantial evidence in the record and is clearly erroneous. Pennzoil does not contest the Commission's finding that other shipments have contained sulfur in amounts similar to the Auger crude, or that Bonito's common stream has historically run sour. Rather, its argument rests on the fact that, unlike the Auger production, the comparable shipments would not affect its "sweet crude upgrade." The threat to the upgrade, however, would result from the combination of Shell's high-sulfur shipments with similar ones from other firms; in arguing that Shell's shipments would "cause" the loss, Pennzoil is implicitly assuming a privileged status for the other high-sulfur shippers based on their temporal priority, but this assumption has no basis in law. Our conclusion that the Commission reasonably excluded that impact is therefore fatal to this argument as well.
 
 
 31
 Pennzoil's further contention, that even if Bonito had to provide access and transportation to Shell, to require Bonito to transport all the Auger production is arbitrary and capricious and contrary to express Commission policy and the OCSLA, fares no better. Pennzoil maintains that the Commission should have determined an allocation methodology, pursuant to Sec. 5(e) of the OCSLA, whereby the Auger crude would be distributed among other available pipelines in the vicinity, including pipelines operated by Shell itself. But the Commission could permissibly conclude that its responsibility to determine the "proportionate amounts" of Auger crude that Bonito must carry under Sec. 5(e) did not arise where the Bonito pipeline had excess capacity. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Pennzoil views Sec. 5(e) as effectively requiring an allocation of blending capacity among OCS pipelines in a particular area, at least when the failure to do so will disrupt contractual rights and expectations. The Commission, by contrast, interprets the statute to require an allocation remedy only when demand exceeds capacity on an individual pipeline. Because the Commission found that the Bonito pipeline currently has excess capacity, it characterized Pennzoil's allocation request as "premature" and refused to consider whether other pipelines in the vicinity should also be required to transport the Auger crude. Order, 61 FERC at p. 61,225.
 
 Section 5(e) provides:
 
 32
 Rights-of-way [over the OCS] ... may be granted ... upon the express condition that oil or gas pipelines shall transport or purchase without discrimination, oil or natural gas produced ... in the vicinity of the pipelines in such proportionate amounts as the Federal Energy Regulatory Commission, in consultation with the Secretary of Energy, may, after a full hearing with due notice thereof to the interested parties, determine to be reasonable, taking into account, among other things, conservation and the prevention of waste.
 
 
 33
 43 U.S.C. Sec. 1334(e). In 1978, Congress amended the OCSLA and added Sec. 5(f), which provides that:
 
 
 34
 [E]very permit, license, easement, right-of-way, or other grant of authority for transportation by pipeline on or across the outer Continental Shelf of oil or gas shall require that the pipeline be operated in accordance with the following competitive principles: (A) The pipeline must provide open and nondiscriminatory access to both owner and nonowner shippers.
 
 
 35
 43 U.S.C. Sec. 1334(f). As interpreted by the Commission, the allocation procedures mandated by Sec. 5(e) apply only when the Commission issues an order to determine the "proportionate amounts" of oil that must be carried by an oversubscribed pipeline. The "open and nondiscriminatory access" provision of Sec. 5(f) stands on its own as a pro-competitive addition to the powers originally granted by Congress in 1953. Because the Commission did not initiate a proceeding to determine "proportionate amounts" under Sec. 5(e), the procedural requirements now invoked by Pennzoil were not triggered by the interconnection and transportation Order under review.
 
 
 36
 Pennzoil's broad interpretation of the Commission's allocation responsibilities is unsupported by the language of the statute. Section 5(e) does not require the Commission to order an allocation, but provides only that the Commission "may" do so.[28] Moreover, the language of Sec. 5(e) supports the Commission's interpretation that the term "proportionate amounts" refers to capacity among shippers on a single pipeline. Although the statute does refer to oil produced "in the vicinity" of OCS pipelines, that reference is to each pipeline's obligation to provide access to nearby production. The statute does not spread the burden of nondiscriminatory access and transportation among the aggregate community of available pipelines.
 
 
 37
 The Commission's interpretation is also consistent with its orders relating to natural gas pipelines on the OCS. See Interpretation of Section 5 of the Outer Continental Shelf Lands Act (OCSLA), Order No. 491, 43 FERC p 61,006 (1988); Order No. 509, supra note 27. Orders No. 491 and 509 discuss the allocation procedures to be adopted under OCSLA Sec. 5. Throughout those orders, the Commission refers to "allocation" exclusively in terms of capacity on a single pipeline. Pennzoil has not identified any instance where the Commission has adopted the broader definition that Pennzoil advocates. We therefore defer to the Commission's reasonable interpretation that its capacity allocation duties apply only when an individual pipeline faces a capacity shortage.[29]
 
 
 38
 Pennzoil additionally maintains that the Commission exceeded its statutory authority under Sec. 5(f) when it ordered Bonito to interconnect with Shell. Pennzoil bases this argument on Sec. 5(f)(1)(B), which restricts the Commission's authority to order an increase in the capacity of pipelines on the OCS. The Commission responds persuasively that by its own terms, Sec. 5(f)(1)(B) applies only to "expansion of throughput capacity" and cannot be read to restrict the Commission's authority to order pipeline interconnections. We thus accept the Commission's determination that it had authority to order an interconnection with an existing pipeline with excess capacity where the interconnection is necessary to the Commission's enforcement of the open access requirements of the OCSLA.[30] Cf. ICC v. American Trucking Ass'n, Inc., 467 U.S. 354, 367, 104 S.Ct. 2458, 2465-66, 81 L.Ed.2d 282 (1984) (agency's discretion to fashion remedies is legitimate provided it furthers the statutory mandate and is closely tied to that mandate).
 
 
 39
 Finally, Pennzoil maintains that the Order amounts to an unconstitutional taking of Bonito shippers' property. In light of Pennzoil's failure to demonstrate that the "sweet crude upgrade" is a cognizable legal right, its constitutional argument also fails. The "sweet crude upgrade" is a windfall that has existed at the discretion of the Ship Shoal owners, who could segregate their stream through batching at any time.[31] Because the Bonito shippers had no legal right to the "sweet crude upgrade," its loss cannot give rise to a takings claim under the Fifth Amendment. See Peterson v. United States Dep't of Interior, 899 F.2d 799, 807 (9th Cir.) ("Without a property right, there could be no 'taking within the meaning of the Fifth Amendment.' ") (citing Bowen v. Public Agencies, 477 U.S. 41, 55-56, 106 S.Ct. 2390, 2398, 91 L.Ed.2d 35 (1986)), cert. denied, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990).
 
 III. SHELL'S STANDING
 
 40
 Although successful in gaining access to the Bonito pipeline system, Shell challenges the Commission's ruling that the ICA does not apply to oil pipelines located wholly on the OCS. See Order, 61 FERC p 61,050, p. 61,221 (1992). We do not reach this issue because we conclude that Shell lacks standing.
 
 
 41
 A party seeking review of a final Commission order under the ICA must demonstrate that it has been "aggrieved" by the order. See 28 U.S.C. Sec. 2344; Earth Resources, 628 F.2d at 235 (applying the Hobbs Act to certain FERC orders concerning oil pipelines). Like all parties seeking access to the federal courts, petitioners are held to the constitutional requirement of standing. Common to both these thresholds is the requirement that petitioners establish, at a minimum, "injury in fact" to a protected interest. See Southwest Gas Corp. v. FERC, 40 F.3d 464, 467 (D.C.Cir.1994); Moreau v. FERC, 982 F.2d 556, 565 (D.C.Cir.1993). To demonstrate "injury in fact," petitioners must identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotation marks, footnote and citations omitted). Pennzoil as intervenor contends, and we agree, that Shell falls short of these minimum statutory and constitutional requirements.
 
 
 42
 Shell, supported by the Commission, asserts injury in fact under the Order because the ICA provides certain rate protections and tariff requirements that have no counterpart in the OCSLA. Most significantly, the ICA provides protection against excessive rates, see 49 U.S.C.App. Sec. 1(5) (rates must be "just and reasonable"), while the OCSLA requires only that rates be nondiscriminatory. See 43 U.S.C. Sec. 1334(e)-(f). Shell argues that the Commission's ruling therefore leaves Shell vulnerable to the risk that Bonito's owners will impose transportation rates that are unreasonable under the ICA but nondiscriminatory under the OCSLA. In addition, Shell notes that the OCSLA does not require pipelines to file tariffs specifying the terms and conditions of transportation services. Because the ICA does impose a tariff requirement, see 49 U.S.C.App. Sec. 6, Shell argues that the Order denies it the statutory right to know the rates and terms used by other shippers. Shell maintains that the denial of these statutory rights constitutes aggrievement and injury in fact.
 
 
 43
 While these arguments are not without some appeal, Shell has failed to point to any existing practices that would have been prohibited under the ICA despite the fact that Auger oil has apparently been flowing into Bonito since June 1994. Nor has Shell yet (at least not as of the time of oral argument) requested relief from the Commission under the ICA's reasonable rate or tariff provisions. Indeed, the only relief Shell has sought under the ICA has been access to transportation services on Bonito--a request that the Commission granted on an alternative statutory basis. In effect, Shell now claims standing to prevent future anticipated injuries that were neither argued to the Commission nor addressed in the Order.
 
 
 44
 This circuit has recognized limited exceptions to the general rule that "a party may not appeal from a disposition in its favor." Showtime Networks, Inc. v. FCC, 932 F.2d 1, 4 (D.C.Cir.1991) (citing cases). Examination of those few cases, however, shows that Shell's posture is distinguishable. The question of Shell's rights to rate and tariff protection under the ICA was not addressed in the Commission proceeding, where application of the ICA was raised only in the context of Shell's effort to gain access to the Bonito pipeline system. Further, as a prevailing party Shell asserts a threat of actual injury that is more remote than the injury asserted in the cases on which it relies.
 
 
 45
 For example, the court has allowed a union to challenge the ICC's jurisdiction to review arbitration awards even though the ICC had upheld the union's position on the merits of the particular arbitration award at issue. See International Bhd. Elec. Workers v. ICC, 862 F.2d 330, 334 (D.C.Cir.1988) ("IBEW" ). In IBEW the jurisdictional question had been the focus of attention at an ICC proceeding: the union had specifically defended the arbitration award on the grounds that the ICC had no jurisdiction to review it, and the ICC acknowledged that its jurisdiction to review the award was " 'the principal issue' " in the petition before it. Id. Here, by contrast, the principal focus of the Order was whether the Bonito pipeline was obligated to provide Shell with access and transportation. Not surprisingly, Shell's submissions to the Commission focused exclusively on statutory provisions in both the ICA and the OCSLA governing access to Bonito. In its reply to Pennzoil's motion, Shell defined "the question before the Commission" as "whether Bonito and its owners have an obligation under the ICA to establish an interconnection to transport Shell's crude oil." J.A. 129 (emphasis added).
 
 
 46
 The risk of injury that Shell now alleges, therefore, flows from the legal rationale employed by the Commission in its Order, not from the denial of relief actually sought by Shell before the agency.[32] Under these circumstances, Shell does not have standing to seek review of the Commission's disclaimer of ICA jurisdiction. For "mere disagreement with an agency's rationale for a substantively favorable decision," even where such disagreement focuses on an interpretation of law to which a party objects,
 
 
 47
 does not constitute the sort of injury necessary for purposes of Article III standing: a litigant's "interest in [an agency's] legal reasoning and its potential precedential effect does not by itself confer standing where, as here, it is 'uncoupled' from any injury in fact caused by the substance of the [agency's] adjudicatory action."
 
 
 48
 Crowley Caribbean Transport, Inc. v. Pena, 37 F.3d 671, 674 (D.C.Cir.1994) (citing Telecommunications Research and Action Center v. FCC, 917 F.2d 585, 588 (D.C.Cir.1990) ("TRAC ")).
 
 
 49
 Shell maintains that its challenge is not based on the "potential precedential effect" of the Order, but rather on the practical impact that it will have on Shell's future business relationship with Bonito's owners--a relationship that will not benefit from the ICA's protective shield. While language in IBEW suggested that the union would have standing to challenge the ICC's jurisdictional ruling "[e]ven if the resolution of this issue is seen as 'collateral' to the merits of the case," IBEW, 862 F.2d at 334, the union's posture was different from that of Shell. Standing was met, the court observed, because "the union has been adversely affected by the Commission's holding" due to the virtually inevitable and repeating costs it would incur in litigating future arbitration awards before the ICC. Id. Shell has not demonstrated that the likelihood of its own future injury rises to the same level of imminence or certainty. Unlike the union in IBEW, Shell has not suffered any cognizable injury that is linked to the agency's substantive adjudication. See TRAC, 917 F.2d at 588. Rather, Shell's allegations of injury rest on a hypothetical scenario whereby (1) Shell cannot purchase additional capacity from one of the Bonito owners as it already has done, (2) all the Bonito owners (who compete among themselves to sell capacity on a pipeline that the Commission has determined to be underutilized) at some point in the future exact excessive but nondiscriminatory transportation rates, and (3) the Commission denies the protection of the ICA. Although such injury is not inconceivable, we are unpersuaded that it is imminent, as it must be under traditional standing analysis.[33]
 
 
 50
 Shell also maintains that the absence of the ICA's tariff provisions constitutes cognizable injury in fact, citing Regular Common Carrier Conference v. United States, 793 F.2d 376, 379 (D.C.Cir.1986) ("RCCC "). That case held that an ICC rule exempting a carrier from the tariff publication requirement constituted injury in fact to the carrier's competitors because it prevented them from knowing what rates were being offered in the trucking market. See id. The court identified the actual injury as follows:
 
 
 51
 When the very basis of attack is the secrecy of rates and hence the inability to challenge them, it would be absurd to hold the controversy unripe because petitioners cannot identify instances where the secret rates have been unreasonable or discriminatory. There is no doubt, moreover, that the rule affects petitioners' primary conduct since it renders them unable to match their competitors' unknown prices.... The competitive injury just described constitutes injury in fact....
 
 
 52
 Id. (citations omitted). Shell cites RCCC for the broad proposition that an agency decision that lifts a tariff filing requirement gives rise to standing for competitors. But the proceeding under review in RCCC specifically concerned the published tariff exemption, which various competitors alleged would cause them an immediate competitive disadvantage. Here, the Commission proceeding concerned an entirely different matter--interconnection with Bonito; moreover, there is much less support for the proposition that the jurisdictional language in the Order "affects [Shell's] primary conduct." Unlike the carriers in RCCC, Shell does not suggest that it needs tariff information in order to match its competitors' prices; indeed, Shell does not even suggest that it competes for shipping business on Bonito.[34] Thus, Shell has not demonstrated that it actually suffers any comparable injury--competitive or otherwise--resulting from the loss of the ICA's tariff obligations.[35]
 
 
 53
 Therefore, we hold that Shell has not demonstrated injury that is "actual or imminent." Moreau v. FERC, 982 F.2d at 565. Our decision does not, however, bar future efforts by Shell to challenge the Commission's conclusion that it lacks jurisdiction under the ICA, if the Commission's adherence to its interpretation produces such an injury to Shell.
 
 
 54
 Accordingly, we deny Pennzoil's petition (No. 93-1762) and we dismiss Shell's petition (No. 92-1634) for lack of standing.
 
 
 
 [1]
 Pennzoil is joined in this petition by the following parties, each of which partly owns the Bonito Pipe Line Company: Cockrell Oil and Gas, L.P., George R. Brown Partnership, Hunt Oil Co., Hunt Petroleum Co., Lamar Hunt Trust Estate, Mesa Transmission Co., Mobile Eugene Island Pipe Line Co., Nelson Bunker Hunt Trust Estate, Pogo Producing Co., Texaco Expl. and Prod., Inc., Texaco Trading & Trans., Inc., and Torch Operating Co. (Pennzoil has informed the court in its brief that Mesa Transmission Co. has sold its interest in Bonito and no longer wishes to remain a petitioner before this court.) For the sake of clarity, this opinion refers to petitioners representing the Bonito ownership interests collectively as "Pennzoil."
 
 
 [2]
 The Bonito pipeline is owned by twenty companies (including Shell, which recently purchased capacity on the pipeline). It is managed and operated by the Bonito Pipe Line Company, a wholly owned subsidiary of Pennzoil
 
 
 [3]
 Pennzoil has also asserted that other OCS pipelines nearby would have served equally well in transporting the Auger crude, and that Shell had intentionally sought access to the Bonito system in order to degrade the value of the Bonito common stream. See infra Part II(B)
 
 
 [4]
 In the view of a majority of the Commissioners, intra-OCS pipelines are not engaged in interstate commerce because the OCS did not fall within the meaning of a "State or Territory" under ICA Sec. 1(1), 49 U.S.C.App. Sec. 1(1) (1988). Order, 61 FERC p 61,050 at p. 61,221. Two Commissioners disagreed with the Commission's ICA jurisdictional ruling. Id. at p. 61,226 (Commissioners Moler and Langdon, dissenting in part)
 
 
 [5]
 See 49 U.S.C.App. Sec. 1(5) (1988) (requiring rates to be "just and reasonable"); id. Sec. 3 (prohibiting "undue or unreasonable preference or advantage"); id. Secs. 6, 15(7) (tariff filing and suspension provisions)
 
 
 [6]
 Pennzoil brought the case under the OCSLA's citizen suit provision. See 43 U.S.C. Sec. 1349(a)-(b) (1988)
 
 
 [7]
 See Pennzoil Exploration and Prod. Co. v. FERC, No. 93-534, 1993 WL 302715, 1993 WL 475486 (E.D.L.A. July 29, 1993 and November 8, 1993). Pennzoil's transferred case was filed as a petition for review in this court on November 17, 1993, and the court consolidated the two petitions by order of November 22, 1993
 
 
 [8]
 28 U.S.C. Secs. 2341 et seq. See also id. Sec. 2321(a) (providing for exclusive review of ICC actions "except as otherwise provided by an Act of Congress")
 
 
 [9]
 Shell's contention that these OCSLA provisions do not apply to the review of administrative orders is contrary to the legislative history and subsequent case law, both of which demonstrate that Sec. 23 contemplated challenges to various administrative decisions in the district courts. See H.R.REP. NO. 590, 95th Cong., 2d Sess. 161-62 (1978), reprinted in 1978 U.S.C.C.A.N. 1450, 1567-68; Trustees for Alaska v. Dep't of Interior, 919 F.2d 119 (9th Cir.1990)
 
 
 [10]
 The Commission agrees with Shell that exclusive jurisdiction over Pennzoil's claim lies with the courts of appeals under the Hobbs Act. It nevertheless maintains that Pennzoil's petition should not be dismissed, and that this court can accept jurisdiction under 28 U.S.C. Sec. 1631 (Transfer to cure want of jurisdiction). Because we determine that the district court had original jurisdiction, we do not address the Commission's argument under this statute
 
 
 [11]
 See 42 U.S.C. Sec. 7172(b) (transferring ICC authority to the Commission "where the regulatory function establishes rates or charges for the transportation of oil by pipeline or establishes the valuation of any such pipeline"); id. Sec. 7155 (transferring to the Secretary of Energy "such functions set forth in the [ICA] and vested by law in the [ICC] ... as relate to transportation of oil by pipeline")
 
 
 [12]
 Section 5(c) of the original OCSLA was amended in 1978 (one year after the DOE Act was enacted) by the Outer Continental Shelf Lands Act Amendments of 1978. See Pub.L. No. 95-372, Sec. 204, 92 Stat. 629, 638-39 (recodified as amended at 43 U.S.C. Sec. 1334(e) (1988))
 
 
 [13]
 In support, Shell and the Commission cite Earth Resources Co. v. FERC, 628 F.2d 234, 235 (D.C.Cir.1980), which stated:
 Under Section 502(a) of the [DOE Act], this court has the same jurisdiction to review FERC orders concerning oil pipelines as it has to review orders of the [ICC].
 Earth Resources, however, is inapposite. The opinion, a four sentence per curiam dismissing a petition under the final order doctrine, concerned the interpretation of jurisdiction over Commission pipeline orders in a petition from an order arising under the ICA, not the OCSLA. As explained below, that distinction is critical.
 
 
 [14]
 See 28 U.S.C. Sec. 2344
 
 
 [15]
 It is unclear whether the DOE Act transferred to the Commission all ICC functions relating to oil pipelines, and thus whether it continues to govern the judicial review of all oil pipeline regulation. The DOE Act specified the ICC authority being transferred by reference both to particular functions and to particular statutory responsibilities. See 42 U.S.C. Secs. 7172(b), 7155 (discussed supra note 11). It is unlikely that the ICC's only existing OCSLA-based authority in 1977--authority to determine reasonable "proportionate amounts" for oil transportation on the OCS--falls within the DOE Act's explicit terms. It was not an ICC responsibility "set forth in the Interstate Commerce Act." Id. Sec. 7155. Nor does it appear to constitute an ICC function relating to "rates or charges" for the transportation of oil. Id. Sec. 7172(b). The DOE Act Conference Report stated that although Sec. 7172(b) meant to transfer the ICC's authority "under other statutes" in addition to the ICA, such transfers only applied "as those statutes relate to the transferred functions"--i.e. to the extent those statutes confer authority to regulate the rates and charges for oil transportation. S.CONF.REP. NO. 367, 95th Cong., 1st Sess. 69 (1977) ("DOE Act Conference Report ")
 
 
 [16]
 The Commission, disagreeing with this view, relies on language in the DOE Act Conference Report, supra note 15, at 79 ("Judicial review of final agency action taken by [FERC] on proceedings ... transferred from the ICC ... will continue to be made in the same manner as if the functions had been retained in the ICC."). Although "we need not consider legislative history when a statute's plain language is unequivocal," Pennington Seed, Inc. v. United States, 10 F.3d 6, 11 (D.C.Cir.1993), we note that the quoted language makes no reference to Sec. 502(a) and appears in an unrelated portion of the report, which did not discuss Sec. 502(a). The Commission has not pointed to anything else, and we have not found anything, in the legislative history to suggest that Congress intended anything other than what it enacted in Sec. 502(a). Where Congress wanted to provide judicial review procedures by reference to the agency that originally exercised the function under review, it clearly knew how to do so. See, e.g., 49 U.S.C. Sec. 1653(c):
 Orders and actions of the Secretary [of Transportation] in the exercise of [transferred] functions ... shall be subject to judicial review to the same extent and in the same manner as if such orders and actions had been by the ... agency exercising such functions ... immediately preceding their transfer.
 
 
 [17]
 Although the parties have not contested our jurisdiction over Pennzoil's petition in the event we conclude that the district court had original jurisdiction over this action, "we must independently satisfy ourselves that it exists." International Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1481 (D.C.Cir.1994)
 
 
 [18]
 None of the parties has questioned the district court's authority to transfer Pennzoil's case to this court. Although Pennzoil opposed the transfer motion filed by Shell and the Commission in the district court, it did not seek reconsideration and it has not interposed any objection to its presence in this court. Based on its motions pleadings in the district court and this court, Pennzoil's opposition to transfer appears to have focused on concern that a transfer might not result in a final resolution of its OCSLA claims
 
 
 [19]
 The existence of two separate petitions does not affect this fundamental insight. Had the Commission determined that the ICA does apply to the Bonito pipeline, its Order might have required Pennzoil to provide access under both the ICA and the OCSLA, and Pennzoil might then have filed a single petition for review of the Order as a whole. Under International Brotherhood and Suburban O'Hare, that review would take place in the court of appeals. Cf. Media Access Project v. FCC, 883 F.2d 1063, 1066-69 (D.C.Cir.1989). The Commission's bifurcated order does not negate the rationale embodied in those decisions
 
 
 [20]
 The advantages of uniformity and consistency in direct appellate review over agency decisions have been invoked repeatedly by the courts, although typically in the context of locating exclusive original jurisdiction in the courts of appeals. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-45, 105 S.Ct. 1598, 1606-07, 84 L.Ed.2d 643 (1985); Natural Resources Defense Council, Inc. v. EPA, 673 F.2d 400, 405 & n. 15 (D.C.Cir.), cert. denied, 459 U.S. 879, 103 S.Ct. 175, 74 L.Ed.2d 143 (1982). The OCSLA forecloses that route by providing that original jurisdiction lies in the district court
 
 
 [21]
 Suburban O'Hare did not confront the precise situation presented here, where one party's ongoing case before a district court with jurisdiction is being consolidated with another party's petition filed in the court of appeals. Yet nothing in Suburban O'Hare suggests that the procedural posture presented here would change its analysis. Similarly, the fact that the district court is located in another circuit is not significant, see 28 U.S.C. Sec. 1404 (change of venue); indeed, Pennzoil's case could have been filed in the district court for the District of Columbia, given the Commission's presence here. See OCSLA Sec. 23(b)(1); 43 U.S.C. Sec. 1349(b)(1) (proceedings "may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose")
 
 
 [22]
 Although the district court in the Eastern District of Louisiana originally suggested a limited transfer of Pennzoil's case, conditional on this court's conclusion that Shell had standing, see Pennzoil Exploration and Prod. Co. v. FERC, No. 93-534, slip op. at 8, 1993 WL 302715 (E.D.L.A. July 29, 1993) ("If the [D.C. Circuit] determines that Shell's appeal is not actionable.... review of the FERC's action will only present OCSLA issues, and will be handled by this Court."), the district court did not include that condition in its subsequent transfer order. Instead, the district court recognized that in light of this court's exclusive jurisdiction over Shell's ICA petition, the logic underlying Suburban O'Hare also applied here and both the ICA and OCSLA determinations should be consolidated in a single proceeding in this court
 
 
 [23]
 For this reason the Commission rejected Bonito's alternative request for a methodology to compensate the current Bonito shippers for the loss of the "sweet crude upgrade" attendant upon Bonito's acceptance of the Auger oil. See id. at p. 61,225
 
 
 [24]
 The Commission found that Bonito has a current capacity of approximately 100,000 barrels per day, of which only approximately 30,000 are currently in use. Id. at p. 61,224-25
 
 
 [25]
 We find no merit in Shell's contention that Pennzoil's claims have been mooted by construction on the Ship Shoal pipeline of a "batching" system that would segregate Bonito oil irrespective of whether Bonito ships the Auger crude. Pennzoil notes not only that the circumstances underlying Ship Shoal's batching policies are subject to change, but also that its contentions under OCSLA Sec. 5(e) that the Auger production should be allocated among other pipelines in the vicinity are not affected by conditions on Ship Shoal
 
 
 [26]
 The Commission has acknowledged the possibility that the Auger shipments might result in the need for a separate allocation proceeding in the event Ship Shoal refuses to accept the additional sour crude volumes from Bonito. See Order, 61 FERC at p. 61,225
 
 
 [27]
 Pennzoil cites only a comment submitted to the Commission in connection with a rulemaking on the application of Sec. 5 to natural gas pipelines on the OCS. See Interpretation of, and Regulations Under, Section 5 of the [OCSLA] Governing Transportation of Natural Gas by Interstate Natural Gas Pipelines on the Outer Continental Shelf, Order No. 509, FERC Stats. & Regs. Preambles 1986-90 p 30,842 (1988), at p. 31,283. In Order No. 509, which concerned the procedures for capacity allocation on individual pipelines, the Commission reprinted a comment that any procedures should "preserve the rights of existing customers," and stated that the final rule was consistent with those views. Id. That statement cannot give rise to an automatic legal stake in the status quo, particularly where the Commission emphasized in the same order that its main "purpose is to remove impediments to access." Id. at p. 31,272
 
 
 [28]
 Pennzoil argues that the word "may" in Sec. 5(e) lacks the normal implications of discretion. Although the term's discretionary meaning "can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute," United States v. Rodgers, 461 U.S. 677, 706, 103 S.Ct. 2132, 2135, 76 L.Ed.2d 236 (1983), Pennzoil has cited no persuasive evidence that Congress used the word "may" to suggest anything other than that the Commission's authority to set proportionate amounts is discretionary
 
 
 [29]
 Our deference to the Commission's interpretation of its Sec. 5(e) obligations disposes of Pennzoil's procedural claims. See OCSLA, Sec. 5(e), 43 U.S.C. Sec. 1334(e). Pennzoil concedes that the procedural protections of Sec. 5(e) merely serve to assist the Commission in determining "proportionate amounts" a pipeline must transport under the statute. Because the Commission found no capacity shortage on Bonito, its decision not to follow the procedures appurtenant to an allocation procedure in Sec. 5(e) is also reasonable. In any event, because there were no material facts in dispute under the view that the Commission properly took, its action did not trigger any statutory obligation, assuming one existed, to hold a hearing. See, e.g., John D. Copanos & Sons, Inc. v. F.D.A., 854 F.2d 510, 522-23 (D.C.Cir.1988); Citizens for Allegan County, Inc. v. Federal Power Comm'n, 414 F.2d 1125, 1128 (D.C.Cir.1969) (noting that "the right of opportunity for hearing does not require a procedure that will be empty sound and show, signifying nothing," and that "no evidentiary hearing is required where there is no dispute on the facts an the agency proceeding involves only a question of law") (citations omitted)
 
 
 [30]
 Pennzoil's contention that the Commission failed to comply with the OCSLA's consultation requirements under Sec. 5(f)(3) is meritless. Even assuming Sec. 5(f)(3) operates to create a private cause of action, but see H.R.CONF.REP. NO. 1474, 95th Cong., 2d Sess. 88 (1978), reprinted in 1978 U.S.C.C.A.N. 1674, 1687 (1978) ("No independent cause of action is created by this consultation requirement."), its requirement applies only where the Commission is considering "specific conditions to be included" in new permits or licenses for oil pipelines on the OCS. It does not affect the Commission's enforcement of existing obligations. See 43 U.S.C. Sec. 1334(f)(3)
 
 
 [31]
 According to Shell and Pennzoil, Ship Shoal has already implemented a batching process to segregate sweet and sour crude shipments. See supra note 25
 
 
 [32]
 Shell argues that it can hardly be penalized for failing to defend the ICA's applicability on the OCS because it was merely responding to Pennzoil's statutory claims in support of its request for a declaratory judgment on pipeline access, and the Commission had given no previous indication that its ICA jurisdiction was in question. Even so, we do not suggest that Shell may never challenge the Commission's ICA ruling for failure to raise the issue before the Commission here. Rather, we conclude that Shell lacks standing in the instant case, a holding that does not preclude Shell from contesting the ruling in another context if and when its claims become justiciable. Indeed, Pennzoil also acknowledges that the ICA rate protection claims were not presented to the Commission
 
 
 [33]
 For the same reason, Shell's reliance on a concurring opinion in TRAC, 917 F.2d at 588 (Silberman, J., concurring), is unavailing. That opinion suggested that standing requirements might be satisfied if an agency opinion establishes a general rule that "creates a cognizable harm through its effects on [a] party's future rights." Id. (emphasis added). Based on a close examination of the "unique facts of [this] case," id. at 589, we are satisfied that Shell has not pointed to evidence of cognizable harm. Nothing in the record demonstrates a concrete threat to Shell's future rights. The TRAC concurrence lends no support to Shell's contention that the hypothetical imposition of unreasonable but nondiscriminatory rates suffices for purposes of finding injury in fact
 
 
 [34]
 Some Bonito shippers have filed tariffs with the Commission. See Order, 61 FERC at p. 61,219 n. 5 (listing owners with tariffs on file)
 
 
 [35]
 At oral argument Shell suggested that it might also be injured by a two year statute of limitations on actions for unreasonable rate violations, see 49 U.S.C.App. Sec. 16(3)(b), and that even if it eventually receives reparations for such harm, Shell would not be made whole if the unreasonable rates deterred Shell from shipping on Bonito. As with Shell's other alleged injuries, these arguments depend on the existence of unreasonable rates--the imminence of which Shell has failed to demonstrate